UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NUMBER:

FILED by **RAL** D.C.
ELECTRONIC

**September 9, 2011**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

AMI B. ESKANOS,
BARRY B. ESKANOS

      Plaintiff,

-vs.-

ALLY FINANCIAL, INC
INDIVIDUALLY AND DOING
BUSINESS AS
GMAC MORTGAGE LLC
INDIVIDUALLY
AND DBA RFC HOMECOMINGS,
JPMORGAN CHASE & CO,
WASHINGTON MUTUAL BANK, FA.
GOLDMAN SACHS BANK USA,
AS OWNER OF LITTON LOAN
SERVICING, LP, OCWEN LOAN
SERVICES LLC,
AS PURCHASER OF LITTON LOAN
SERVICING, LP,
LITTON LOAN SERVICING, LP,
DEBRA LYMAN,
STEPHANIE JACKSON
CYNTHIA A. RILEY

      Defendant

# 11-CV-23267-SEITZ/SIMONTON

---

**PLAINTIFF'S VERIFIED COMPLAINT FOR COMPLAINT FOR DAMAGES FOR DEFENDANT ALLY FINANCIAL, INC., INDIVIDUALLY AND DOING BUSINESS AS GMAC MORTGAGE LLC'S, INDIVIDUALLY AND DBA (DEFENDANT) RFC HOMECOMINGS, LITTON LOAN SERVICING, LP, DEFENDANT WASHINGTON MUTUAL BANK, FA, DEFENDANT JP MORGAN CHASE VIOLATIONS OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA"), 15 U.S.C. § 1692 ET. SEQ.; RACKETEERING, CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies); MAIL AND WIRE FRAUD 18 U.S.C., SECTIONS 1341, 1343; BANK FRAUD 18 U.S.C. 1341, 1344; VIOLATION OF 18 U.S.C. § 1001; VIOLATION OF 18 U.S.C. § 1005; VIOLATION OF HAMP; VIOLATION OF 12 C.F.R. §202.16, EQUAL OPPORTUNITY ACT, REGULATION B
DECLARATORY RELIEF**

1

**AND DAMAGES PURSUANT TO FLORIDA STATUTE CHAPTER 701.04 (1)**

**JURY DEMANDED**

COMES NOW, Ami B. Eskanos and Barry B. Eskanos, Plaintiffs, and for their Complaint against DEFENDANT ALLY FINANCIAL, INC., INDIVIDUALLY AND DOING BUSINESS AS GMAC MORTGAGE LLC'S, INDIVIDUALLY AND DBA (DEFENDANT) RFC HOMECOMINGS, GOLDMAN SACHS GROUP INC., NEW YORK, THE INDIRECT OWNER OF LITTON LOAN SERVICING, LP, DEFENDANT WASHINGTON MUTUAL BANK, FA, DEFENDANT JP MORGAN CHASE, LITTON LOAN SERVICING, LP, DEBRA LYMAN and STEPHANIE JACKSON, jointly and severally, allege as follows:

**INTRODUCTION AND NATURE OF ACTION**

1.      This action arises as a result of the Defendant ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE, LLC, Individually and Doing Business as RFC Homecomings and co-conspiring with GOLDMAN SACHS GROUP, INC., (GOLDMAN SACHS), A registered bank holding company, owns and controls GOLDMAN SACHS BANK USA, NEW YORK, NEW YORK (SACHS BANK), A STATE CHARTERED BANK THAT IS A MEMBER OF THE FEDERAL RESERVE SYSTEM, AND THE SACHS BANK, UNTIL SEPTEMBER 1, 2011, INDIRECT OWNER OF LITTON LOAN SERVICING LP, HOUSTON, TEXAS (LITTON) at which time, it was sold to DEFENDANT OCWEN LOAN SERVICES LLC (HEREINAFTER REFERRED TO AS "OCWEN"), during the relevant times herein, and the individual entity, Litton Loan Servicing, LP, and each of their: (1) refusal to acknowledge receipt of Plaintiffs application which met all the terms and conditions and were in compliance with the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP), refusal to comply with the obligations of the HAMP program, refusal to even consider the Plaintiffs application under the HAMP, refusal to appoint a single point of contact under HAMP, refusal to provide Plaintiffs a TPP, refusal to stay a

2

pending proceeding pursuant to HAMP, and failure and refusal to perform any and all of the obligations owed Plaintiff under HAMP; (2) refusal to notify the Plaintiffs of their rights to apply for, nor did Defendants comply with the requirements of HELP FOR HOMEOWNERS (H4H); (3) commission of violations of Regulation D; (4) commission of mail fraud (18 U.S.C., SECTIONS 1341, 1343); (5) commission of bank fraud (18 U.S.C. 1341, 1344); (7) violating the RICO act; (8) violating the Fair Debt Collection Practices Act[1]; (9) lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation in criminal violation of 18 U.S.C. § 1001 and 18 U.S.C. § 1005; (10) commission of civil conspiracy; and (11) filing false documents with the court in a foreclosure action (a false affidavit and a forged promissory note); (12) willful, intentional, and stated refusal to comply with Florida Statute 701.04 (1) after proper demand; (13) willful, intentional, and ongoing violation of the terms and conditions of the cease and desist order stipulated, signed, and entered into, between the OCC and JPMorgan Chase on April 13, 2011; (14) perjury and the other wrongful acts complained of herein, and proven at the time of trial.

2.      Defendant Washington Mutual Bank, FA, (1) refusal to acknowledge receipt of Plaintiffs application which met all the terms and conditions and were in compliance with the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP), refusal to comply with the obligations of the HAMP program, refusal to even consider the Plaintiffs application under the HAMP, refusal to appoint a single point of contact under HAMP, refusal to provide Plaintiffs a TPP, refusal to stay a pending proceeding pursuant to HAMP, and failure and refusal to perform any and all of the obligations owed Plaintiff under HAMP; (2) refusal to notify the Plaintiffs of their rights to apply for, nor did Defendants comply with the requirements of HELP FOR HOMEOWNERS (H4H); (3) commission of violations of

---

[1] Defendant Washington Mutual Bank, FA successfully argued to the court that they were the ONLY entity entitled to recover under the note. However, Litton Loan Servicing, on the behalf of RFC Homecomings and GMAC MORTGAGE LLC unlawfully sent more than 30 letters demanding payment for the same purported debt, the exact number will be proven at trial. Each separate letter, then, is a separate violation of the Federal Fair Debt Collection Practices Act.

3

Regulation D; (4) commission of mail fraud (18 U.S.C., SECTIONS 1341, 1343); (5) commission of bank fraud (18 U.S.C. 1341, 1344); (6) lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation (18 U.S.C. § 1001 and 18 U.S.C. § 1005); (7) continuing to do business in violation of the cease and desist orders of the OTS and Federal Court Receivership (now OCC); (8) Failing to comply with the "consent order" for JP Morgan Chase which required the Defendant to engage an independent firm to conduct a multi-faceted review of foreclosure actions. The third-party consultant will assess whether foreclosures complied with federal and state laws, whether foreclosures occurred when grounds for foreclosure were not present, such as when loans were performing, and whether any errors, misrepresentations or other deficiencies resulted in financial injury to borrowers. As part of that review, the enforcement actions require each servicer to establish a process for borrowers who to request their case be reviewed and considered for remediation if they believe they have suffered financial harm as a result of improper foreclosure actions.

Each servicer must submit a plan to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the independent consultant's findings as required by the OCC; (9) lying to and providing false information to agents of the Federal Government (OCC) conducting an official investigation in criminal violation of 18 U.S.C. § 1001 and 18 U.S.C. § 1005; (10) violating the RICO act; (11) commission of civil conspiracy; and (12) filing false documents with the court in a foreclosure action (a false affidavit and a forged promissory note); (13) willful, intentional, and stated refusal to comply with Florida Statute 701.04 (1) after proper demand; (14) perjury and the other wrongful acts complained of herein, and proven at the time of trial. Plaintiffs are entitled, and are seeking a Declaratory relief order from this Court, finding that the judgment of foreclosure was obtained in violation of the Constitutional rights of the Plaintiffs; was obtained by means of fraud; and an order setting aside the judgment of foreclosure that was fraudulently obtained, and obtained in violation of the US and State Constitutional Rights of the Plaintiffs, including, but not limited to 5th and 14th Amendment Due Process

4

and Constitutional Violations; and to set aside the judgment as an independent action as further authorized by Florida Statutes Florida Rule of Civil Procedure 1.540, et seq.

3.      On Thursday, September 25, 2008, the United States Office of Thrift Supervision (OTS) seized Washington Mutual Bank from Washington Mutual, Inc. (including all original residential loan documents such as notes and mortgages as well as the buildings that housed those files) and placed it into the receivership of the Federal Deposit Insurance Corporation (FDIC). The FDIC Receiver subsequently sold the banking subsidiaries (minus unsecured debt or equity claims) to JPMorgan Chase for $1.9 billion which JPMorgan Chase who has always disavowed any right, title, or interest under the note and claims Plaintiffs do not owe Washington Mutual Bank, FA or JPMorgan Chase any money.  However, JPMorgan Chase Bank (and Washington Mutual Bank, FA) instead of dismissing the action, allowed  the foreclosure litigation to proceed in the name of Washington Mutual Bank, FA falsely claiming that although the subject note was sold to Defendant ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE, instructed their employee, CYNTHIA A. RILEY, to endorse en blanc, on behalf of WAMU, (a bank that was ordered to cease and desist operations), a forged promissory note and deliver it via the US Mail and by means of interstate commerce, or other mail service, for the purpose of furthering the conspiracy as complained of herein, to Litton Loan Servicing, Individually and Doing Business as RFC Homecomings and their co-conspirator, their servicing agent, Litton Loan Servicing, LP; the asset (note) was lost, and thus had never been transferred to the GMAC, RFC or Litton, and thus, according to the position they took with the state court was, that Washington Mutual Bank, FA, that because of CYNTHIA A. RILEY's blanc endorsement, claimed that WAMU, was the only entity entitled to recover under the note.  Because of the seizure of all assets by the Office of Thrift Supervision, and because of the sale and transfer of all assets to JPMorgan Chase, and because Washington Mutual Bank, FA was ordered to cease and desist from doing any further business by the OTS; the subject note became the property of JPMorgan Chase, who, throughout the entire case, and presently, disclaim any right, title or interest in recovering any sum under that note,

5

show that the note is paid in full, and further acknowledging that it was sold in March 25, 2005, five days prior to the filing of the foreclosure action (filed March 30, 2005) (See the false affidavit of Defendant, Debra Lyman, the only evidence submitted by the Plaintiff in support of their Motion for Summary Judgment and the forged promissory note). When a complaint was filed with the OCC against JP Morgan Chase for their complicity, conspiracy, and participation in the fraud upon the court and upon the Eskanos', Defendant JPMorgan Chase, and Defendant Stephanie Jackson, an employee in the Chase Home Lending Executive Offices then provided false information and made false statements to the OCC in the hopes that the OCC would discontinue their investigation against CHASE. Defendant JPMorgan Chase, in other communications with the OCC as well, provided them with false and misleading information in order to further their conspiracy with the defendants and in order to ratify the wrongful conduct of CYNTHIA A. RILEY.  Defendant JPMorgan Chase, when presented with a plethora of information about the misdeeds and misconduct of the co-defendants as complained of herein ratified the wrongful conduct of the co-defendants[2].

---

[2] From: Kaplan, Nicole [mailto:nicole.kaplan@jpmchase.com]
Sent: Tuesday, January 18, 2011 4:40 PM
To: Danny E. Eskanos
Subject: RE: Washington Mutual v. Ami Eskanos, FW: Further research

I have reviewed all of the documents you sent as well as documents sent by Akermann Senterfitt. I have also conducted independent research regarding this case.  After a thorough review of everything, it appears the foreclosure was conducted appropriately.  We will not be able to assist you any further in this matter.



**Nicole Kaplan**
VP and Assistant General Counsel at JP Morgan Chase
Greater New York City Area
Law Practice

6

4.      Defendant Litton Loan Servicing, LP., and OCWEN as the purchaser of LITTON,

individually, and doing business as the designated servicing agent, while acting on the behalf, and with the

consent, and subsequent to Litton Loan Servicing, LP[3] illegal acts, for Defendant GMAC, individually and

DBA RFC Homecomings (1) refused to comply with Florida Statute 701.04 (1); (2) refused to comply with

the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP); (3) refused to

comply with the requirements of HELP FOR HOMEOWNERS (H4H); (4) committed mail fraud (18

U.S.C., SECTIONS 1341, 1343); (5) committed bank fraud; (6) committed civil conspiracy; (7) violated the

RICO act; (8) conspired with Litton Loan Servicing to violate the Fair Debt Collection Practices Act; (9)

lied to and provided false information to agents of the Federal Government (OCC) conducting an official

investigation; (10) committed perjury; and (11) obtained a judgment of foreclosure against the Plaintiff

using a forged promissory note and forged affidavit prepared and filed by Defendant ALLY FINANICAL

---

Current

- **VP and Assistant General Counsel at <u>JP Morgan Chase</u>**

Past

- Consultant at <u>Chase Home Finance</u>
- Consultant at <u>Chase Home Finance</u>
- Associate at <u>Dickstein Shapiro LLP</u>
  see all

Education

- Brooklyn Law School
- University of Pennsylvania

Connections

**83** connections

Public Profile

http://www.linkedin.com/pub/nicole-kaplan/13/a29/913

[3] Defendant Litton Loan Servicing, on Thursday, August 6th, 2009, signed an agreement with the US Treasury Department to become the 40th participant in the Home Affordable Modification Program (HAMP). Litton further agreed, on or about September 1, 2011, and is currently violating that agreement in this case, to stop their practice of fraudulently signing and halt foreclosures of homes if mortgage paperwork was fraudulently signed as part of a settlement with New York's Department of Financial Services and Banking Department.

7

INC., which wholly owns GMAC MORTGAGE LLC, Individually and Doing Business as RFC Homecomings and co-conspiring with their servicing agent, Litton Loan Servicing, LP individually, and on behalf of Defendant THE GOLDMAN SACHS GROUP, INC., a registered bank holding company, that owns and controls Goldman Sachs Bank USA, New York, New York, a state-chartered bank that is a member of the Federal Reserve System, and the Goldman Sachs Bank USA until September 1, 2011, indirectly owned (subsidiary) Litton Loan Servicing LP, Houston, Texas, and the other wrongful acts complained of herein, and proven at the time of trial. Litton was sold to Defendant OCWEN on September 1, 2011. Litton further agreed, and as a condition to the State of New York permitting the sale to be completed, on or about September 1, 2011, and is currently in breach of that newly formed agreement in this case which requires Litton to withdraw any pending foreclosure actions in which filed affidavits were Robo-signed or otherwise not accurate, as well as the other provisions of which are incorporated herein, and attached hereto, in full. Litton, individually, and on behalf of the remaining Defendants, is in direct and continuing breach of their Agreement on Mortgage Servicing Practices, which was intended to protect the Plaintiffs, and others similarly situated, as third party beneficiaries of that agreement with New York's Department of Financial Services and Banking Department of September 1, 2011[4] on the following grounds:

       1.    As is pled herein, the Affidavit of Debra Lyman is fraudulent. JP Morgan Chase has already notified the OCC that the Affidavit of Debra Lyman is false. The affidavit states that the loan was sold on March 25, 2005, "subsequent" to the suit being filed, but March 25, 2005, is five days prior to the suit being filed. The date it was signed is PRIOR to some of the events which the affidavit says already occurred, including the filing of the "original note". The affidavit states that the original note was filed, but the note your office filed is a forgery.

---

[4] STATE OF NEW YORK DEPARTMENT OF FINANCIAL SERVICES BANKING DEPARTMENT AGREEMENT ON MORTGAGE SERVICING PRACTICES, SEPTEMBER 1, 2011, ATTACHED HERETO AS EXHIBIT AND INCORPORATED HEREIN IN FULL.

8

      2.     Plaintiffs provided Litton with a HAMP application, and were qualified for the same, and it was ignored. No timely response was given, and thus, Litton individually, and on behalf of the remaining Defendants, are in violation of that portion of the agreement they signed on September 1, 2011, as well.

      3.     Litton is currently placing forced placed insurance on our property without using the carrier Plaintiff selected.

      4.     Only parties and entities possessing the legal right to foreclose can sue borrowers, yet Litton intentionally and willfully is in violation of this provision.

      5.     Litton is currently and already in violation with the remainder of the provisions of their agreement by failing to withdraw their suit as required by that agreement.

      6.     Litton has failed to appoint a single point of contact.

      7.     After receiving a cease and desist demand from the Plaintiffs, Litton, by and through their attorneys, Akerman Senterfitt cancelled a scheduled a motion to set the home of the Plaintiffs for sale and reset it for one week later.

      8.     After the sale to Ocwen, and after first cancelling a motion to set the Plaintiffs home for sale, On September 2, 2011, Litton's counsel filed a notice of cancellation of the old date, and reset the hearing for a week later, AFTER LITTON and OCWEN received a CEASE and DESIST demand from the Plaintiff, and after Litton executed the September 1, 2011 agreement (it was mailed out on September 2, 2011) after the Plaintiff tendered a CEASE AND DESIST demand on Litton, and copied the State of New York and Ocwen on the 1st of September, 2011. By the date of the filing of this complaint, that Motion has not been withdrawn, and the suit also has not been withdrawn. As a result of the conduct of resetting the motion, OCWEN has ratified the wrongful conduct of Litton and is liable for all conduct from the outset and become a co-conspirator with the defendants, jointly and severally.

9

5.    According to the Sworn Affidavit of Debra Lyman, VP of Litton Loan Servicing, LP., on March 25, 2005, Washington Mutual Bank, FA sold the subject note to Defendant RFC Homecomings, now GMAC and all the files and documents were transferred to GMAC individually and DBA Defendant RFC Homecomings, and Litton Loan Servicing at that time.

6.    According to the information provided to the investigators at the OCC, the note was sold on April 19, 2005.

7.    Suit was actually filed on March 30, 2005.

8.    If the sworn testimony of Debra Lyman is true, then Stephanie Jackson gave false information to the OCC, and there was never standing to file suit.

9.    If the subsequently provided (and changed story) by Defendant Stephanie Jackson is true, then the subsequently provided statement to a Federal Employee conducting an official investigation to the contrary of Debra Lyman's sworn testimony means that Debra Lyman committed perjury.

10.    Other parts of Debra Lyman's testimony in her affidavit are also factually impossible, including, but not limited to:

a) The complaint alleges that the promissory note was lost, and provides a certified copy of the promissory note of the original, which then differed substantially from the note that Debra Lyman swore was an original that was fraudulently found and filed years later;

b) The complaint alleges that Washington Mutual Bank had all right title and interest in the loan, but the affidavit of Debra Lyman states it was sold five days prior to the suit being filed and all right, title and interest was transferred to RFC Homecomings at that time;

c) The affidavit of Debra Lyman states the loan was sold on March 25, 2005 and the Defendant, said it was April 19, 2005;

10

        d) Debra Lyman discussed events that occurred on and after the date she signed the affidavit;[5]

        e) Debra Lyman testified that "

I have reviewed and am personally familiar with Ms. Eskanos' loan file, including all documents transferred from Washington Mutual, which is maintained by Litton and is within my custody and control.  Entries in Ms. Eskanos' loan file are made by Litton employees with personal knowledge of the information being entered at or about the time the information is received or created.  This is Litton's regular course of business.

"That testimony, in conjunction with the testimony that "the original promissory note" was filed, means that Debra Lyman was responsible for filing the forged promissory note; and Washington Mutual Bank, FA lied to the court when it said that the note was "found" in the possession of Washington Mutual Bank, FA and had not been transferred.

    11.    The amount of attorney's fees sought are excessive and neither authorized by the order of the court, nor permitted by the Agreement.

    12.    Two contradictory statements that were given to the court by Litton's Debra Lyman in contrast to the statements made to the OCC during an official investigation, can only mean one of the two statements were false and irrefutable evidence of lying to a federal official during the course of litigation or perjury during the course of an official investigation.

    13.    Debra Lyman, in her affidavit, also concealed and failed to inform the court of the fact that Washington Mutual Bank, FA was paid in full, concealing from the court the $373,907.18 in principal actually received but never credited.

---

[5] The Defendant Debra Lyman's Affidavit stated a Total amount due up to December 31st, 2008, but signed the affidavit on February 25th, 2008; and claims the original note was already filed, but the forged note was not filed until May 1, 2009.  The Lyman Affidavit swore to facts that had not yet even occurred. It was not filed with the court until just before the Summary Judgment Motion was heard by the court.
11

14.     Defendant, Debra Lyman, as a robo-signer, in her position of VP of Litton Loan Servicing, as servicing agent for GMAC and RFC Homecomings, owed the Defendants, and others, a higher duty of care than that of a reasonable person, but instead, a fiduciary duty owed by all members of the financial community in dealing with the financial affairs of the banks and financial institutions.

15.     Defendant Litton Loan Servicing, LP, falsely held themselves out to the court as Servicing Agent for Washington Mutual Bank, FA in an attempt to seize insurance proceeds from hurricane damage suffered by the Plaintiffs, to their home.

16.     Defendant Debra Lyman, VP of Litton Loan Servicing, LP, who falsely held herself out as authorized agent for Washington Mutual Bank, FA, voluntarily placed herself in the position of being held responsible as an agent and employee of FDIC guaranteed institutions, Washington Mutual Bank, FA and JP Morgan Chase Bank.

17.     Defendant, Debra Lyman, then, by her false representations to the court and concealment of material facts, and other acts complained of here, individually, and doing business as the designated servicing agent, while acting on the behalf, and with the consent, and subsequent to Litton Loan Servicing, LP illegal acts,  for Defendant GMAC, individually and DBA RFC Homecomings (1) refusal to comply with Florida Statute 701.04 (1); (2) refusal to comply with the requirements of HOME AFFORDABLE MODIFICATION PROGRAM (HAMP); (3) refusal to comply with the requirements of HELP FOR HOMEOWNERS (H4H); (4) committed mail fraud (18 U.S.C., SECTIONS 1341, 1343); (5) committed bank fraud, 18 U.S.C. 1341, 1344; (6) violated 18 U.S.C. § 1001; (7) violated 18 U.S.C. § 1005; (8) committed civil conspiracy; (9) violated the RICO act; (10) conspired with Litton Loan Servicing and each and every one of the other Defendants, to violate the Fair Debt Collection Practices Act; (11) lied to and provided false information to agents of the Federal Government (OCC) conducting an official investigation; (12) committed perjury; and (13) obtained a judgment of foreclosure against the Plaintiff using a forged promissory note and forged affidavit prepared and filed by Defendant ALLY FINANICAL INC., which

12

wholly owns GMAC MORTGAGE LLC, Individually and Doing Business as RFC Homecomings and co-conspiring with their servicing agent, Litton Loan Servicing, LP and the other wrongful acts complained of herein, and proven at the time of trial. Further, Litton, individually, and on behalf of the remaining defendants, willfully and intentionally violated the agreement they entered into on September 1, 2011 with the New York Department of Financial Services.

18.     Defendant Stephanie Jackson, Chase Home Lending Executive Office employee, was responsible for responding to the complaint Plaintiffs filed with the OCC regarding the conduct of JPMorgan Chase.

19.     As an officer and employee of the bank, JPMorgan Chase, Defendant Stephanie Jackson is responsible for being truthful when responding to the Federal Governmental Officials conducting an official investigation, or be subject to liability under 18 U.S.C. § 1005.

20.     When requested, Stephanie Jackson told the OCC that Chase confirmed with their lawyers, Shapiro and Fishman that their name had been removed from the lawsuit, she lied.

21.     Stephanie Jackson also lied directly to the OCC with the intention of deflecting the investigation from JPMorgan Chase, and in addition to being charged with violation of 18 U.S.C. § 1005, Defendant Stephanie Jackson's conduct clearly showed a conspiracy between JPMorgan Chase, their disrepute attorneys, Shapiro and Fishman, Litton Loan Servicing, ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE LLC, and Defendant Stephanie Jackson to harm the Plaintiffs and avoid prosecution by authorities.

22.     Stephanie Jackson's lie was further compounded by the fact that the judgment was in the name of Washington Mutual Bank, FA, listing Litton Loan Servicing's address as the place of business for Washington Mutual Bank, FA.

23.     Further facts in support of Plaintiff's RICO claim, include the post seizure, and under order of the Federal Government, Washington Mutual Bank, FA was and is not permitted to conduct any business,

13

as all of its assets were seized by the Office of Thrift Supervision's Receiver, (the OTS is now combined with the OCC).

      a.    Washington Mutual Bank, FA., was ordered to cease and desist operations, cannot have any assets, had no real property in their name, had no physical location to store the note in their name, nor any documents, and, in point of fact, could not and did not have possession of the note that was subsequently and falsely alleged to have been found.  It was not found, it was forged.

      b.    Any documents it may have had, were transferred either to Litton when the loan was sold, or, transferred in the sale to JPMorgan Chase.

      c.    A third alternative could be that it remains the estate of Washington Mutual, Inc., but they filed bankruptcy, and did not list this loan as an asset in their bankruptcy pleadings.

24.    Defendant Stephanie Jackson's conduct in lying to the OCC, also included her stating that the sale occurred on April 19, 2005 in contradiction to the sworn testimony of Debra Lyman, stating that the sale occurred on March 25, 2005, five days prior to the suit being filed.

25.    Stephanie Jackson's lie to the OCC was made with the intention to overcome the presumption that Washington Mutual Bank, FA had no standing to sue because of the April 19th, 2005 date rather than the March 25th, 2005 date.

26.    In September 2008 Washington Mutual Bank was seized by regulators with the Office of Thrift Supervision and all of the residential mortgage assets (including all original residential loan documents such as notes and mortgages as well as the buildings that housed those files) were sold and transferred to JPMorgan Chase Bank, who also disavowed any right, title, or interest under the note.

27.    Washington Mutual Bank filed Bankruptcy in September 26, 2008 and did not list the note securing the Plaintiff's home as an asset of that bankruptcy; did not transfer the action to the bankruptcy court, and failed to inform the creditors of the purported asset belonging to Washington Mutual Bank, FA,

14

thereby violating the cease and desist order of the Office of Thrift Supervision and the rules of the Bankruptcy Court and statutes governing bankruptcy of companies.

28.     Plaintiffs in this action have never made any payments to ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE LLC or its entity, RFC Homecomings, and more than five years have passed since the Plaintiffs acquired their home.

29.     Plaintiffs have no contractual relationship nor did they have any contact with RFC Homecomings or ALLY FINANICAL INC., which wholly owns ALLY FINANICAL INC., which wholly owns GMAC MORTGAGE LLC (hereinafter referred to as GMAC) since the purchase of their home, other than making formal demands to dismiss the action in 2005; demands to Litton Loan Servicing LP, to release the insurance proceeds stolen from the Plaintiffs during the pendency of the foreclosure litigation; and demands for estoppel certificates pursuant to Florida Statute 701.04 (1).

30.     In response to the Plaintiffs demands, contrary to the sworn testimony of Litton Loan Servicing, GMAC's Agent, GMAC informed the Plaintiff that GMAC had no interest in the Plaintiffs home; did not have a loan in their name, and further stated that Litton Loan Servicing was not servicing any of GMAC's loans.

31.     Without any right, title or interest, Litton Loan Servicing illegally and unlawfully, all on behalf of GMAC individually and DBA Defendant RFC Homecomings, has sent an excess of 40 collection letters, seeking money that GMAC, RFC and by their own admission, do not belong to GMAC.

32.     Defendant GMAC allowed Defendant Litton Loan Servicing to continue to pursue the Plaintiffs, knowing it had no right, title or interest in the Plaintiff's home; was a disreputable firm who committed numerous acts of fraud and committed actual knowing fraud against the Plaintiffs; and therefore Defendant GMAC ratified all the wrongful acts committed by Litton Loan Servicing and its disreputable lawyers.

15

33.    In May of 2011, Plaintiffs informed Brett Mohler of GMAC of the complaints, history of the case, proof of the forgery, and proof of the fraudulent affidavit and claims against GMAC and RFC Homecomings.

34.    In or about June of 2011, after reviewing all of the facts and evidence, Brett Mohler of GMAC ratified the wrongful conduct of Litton Loan Servicing, LP in its entirety, said there was nothing he could do, and referred the Plaintiffs to contact Litton Loan Servicing, LP as their loan servicer, for resolution of the Plaintiffs complaint.

35.    The Defendants, and each of them, co-conspired to commit fraud upon the Plaintiffs and other homeowners similarly situated.

a.    The Florida State Bar, the 50 State Attorney Generals, and the FBI are all investigating the mortgage fraud and other wrongful acts of Litton Loan Servicing as well as a pattern of mortgage fraud and other related acts wrongfully committed by GMAC, establishing a pattern of wrongful behavior, a criminal conspiracy and joint venture between Litton Loan Servicing, GMAC, and its lawyers, to harm the Plaintiff and others similarly situated.

b.    The investigation by the OCC of the Defendants as part of an interagency horizontal review of major residential mortgage servicers, has conducted an examination of the residential real estate mortgage foreclosure processes of JPMorgan Chase Bank, N.A., New York, New York ("Bank"). The OCC has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings. Said deficiencies showed a pattern and practice sufficient to warrant Plaintiff's claims for RICO violations as pled herein.

c.    The investigation by the OCC of the Defendants as part of an interagency horizontal review of major residential mortgage servicers, has conducted an examination of the residential real estate mortgage foreclosure processes of GMAC and CHASE. The OCC has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of

16

foreclosure proceedings. Said deficiencies showed a pattern and practice sufficient to warrant Plaintiff's claims for RICO violations as pled herein.

36.     On or about November 4, 2010, Plaintiff filed complaints with, among others, the Office of the Comptroller of the Currency (OCC) regarding the forged document and false affidavit.  In response to that complaint, the OCC began an investigation.

37.     Plaintiffs are informed, believe and thereon allege that Cynthia A. Riley was a Vice President of Washington Mutual Bank, FA, prior to the seizure by the Office of Thrift Supervision September, 2008, and during all relevant times herein.

38.     That at some time after the seizure by the Office of Thrift Supervision, Cynthia A. Riley became an employee of Defendant JPMorgan Chase.

39.     That, according to the Defendant Washington Mutual Bank, FA and their legal counsel, the forged promissory note that was lost, was discovered after September 2008.

40.     That after the discovery of the purported note after September of 2008, Cynthia A. Riley on behalf of herself, on behalf of JPMorgan Chase, as her employer, and on behalf of Washington Mutual Bank, FA, and in furtherance of the conspiracy complained of herein, placed, or caused to be placed, the en blanc endorsement on the forged promissory note.

Pay to the order of


Without Recourse
Washington Mutual Bank, FA

Cynthia A. Riley, Vice President

17

41.     That, at the time she placed her stamp, or caused her stamp to be placed on the forged note, she knew, or reasonably should have known, that the note was a forgery.

42.     That, while all other pages to the document which she placed her stamp, or caused her stamp to be placed on said note, was of an onion skin type paper, the signature page which contained the forged signature, was of a copy type paper, wholly and distinctly different from the remaining pages.

43.     That, the differences in the types of paper, the font, and other apparent differences visible to the naked eye, and apparent to any reasonable person, and clear fact that the last signature page was a copy Cynthia A. Riley knew, or reasonably should have known that she was stamping, or causing her stamp to be placed on a forgery.

44.     Further, since the documents on file create a reasonable inference that the signed endorsement in blank or "bearer" endorsement allegedly made by "WASHINGTON MUTUAL BANK, FA By CYNTHIA RILEY VICE PRESIDENT" was placed upon the original note at some point in time after September 8, 2008, and according to the sworn affidavit of Debra Lyman, that all right title and interest in the note transferred to RFC Homecomings, GMAC on March 25, 2005; and Washington Mutual Bank, FA relinquished all of its rights to the Note and Mortgage prior to filing suit; and the seizure of Washington Mutual Bank, FA and the imposition by the Office of Thrift Supervision (now the OCC) of a cease and desist order; her stamp, or her causing of the placing of a Washington Mutual Bank, FA endorsement after the assignment, and cease and desist order, prohibiting any further acts by Washington Mutual Bank, FA whatsoever;  is irrefutable proof and clear and convincing evidence that Washington Mutual Bank, FA's endorsement is unauthorized and Vice President, Cynthia Riley's, signature on the original Note is unauthorized as a matter of law, and clear evidence that the note that was filed by Washington Mutual Bank, FA, Cynthia A. Riley, Debra Lyman, Litton Loan Servicing, GMAC, and RFC Homecomings, was a forgery; and further within the last six months, Plaintiff spoke to CYNTHIA A. RILEY on the telephone, wherein she ratified her wrongful conduct and ratified her furtherance in the conspiracy, claiming that she

18

had and has the authority to perform acts on behalf of Washington Mutual Bank, FA after it was closed; admitted her employment with JP Morgan Chase, and as such, ratified her conduct as an employee of JP Morgan Chase; attempted to conceal further liability by refusing to disclose facts regarding her role in the endorsement of the note, and implied that she regularly performed similar acts of endorsing notes in blanc after the seizure and while employed by JP Morgan Chase; and to say that all in conspiracy with her co-defendants, and each of them, and their lawyers, Shapiro and Fishman and Akerman Senterfitt..

45.     That, at all relevant times herein, Cynthia A. Riley was an employee of Washington Mutual Bank, FA or September of 2008, or, thereafter, an employee of JPMorgan Chase Bank, both FDIC Guaranteed institutions. According to their Annual Report, JPMorgan Chase & Co. (NYSE: JPM) is a leading global financial services firm with assets of $2.1 trillion and operations in more than 60 countries.

46.     That as a result of being an employee of those banks, owed fiduciary and other higher duties to the Plaintiffs, and owed Plaintiffs a higher standard of care than a reasonable person standard, but one of a fiduciary standard.

47.     That, as a result of that higher fiduciary duty standard, special skill and training, when Defendant Cynthia A. Riley was presented with a note, where the first pages were of a wholly and distinctly different kind of onion skin paper than the signature page, and the signature page was of commonly found copy paper, and bore copy marks and lacked other significant and commonly found marks, like the scanner bar mark; she, as a fiduciary, had the special skill, or should have had the special skill and knowledge, to know that the document presented to her for her endorsement was, in fact, a forgery.

48.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she furthered the scheme and artifice to defraud the Plaintiffs, and ratified her conduct within the past six months.

19

49.     That, after endorsing, or causing to be endorsed with her stamp and signature, the forged note, she used the US Mail or other mail services, to deliver the forged document to the lawyers for Defendant Litton Loan Servicing, Washington Mutual Bank, FA, and JPMorgan Chase.

50.     That the forged document was mailed across state lines, using means of interstate commerce, in furtherance of conspiracy of the Defendants, and each of them.

51.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §  1692 et. seq.;

52.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.;

53.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the 18 U.S.C. 1964, (Civil Rico Remedies).

54.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase,

20

Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Mail and Wire Fraud 18 U.S.C., sections 1341, 1343.

55.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the bank fraud statutes, 18 U.S.C. 1341, 1344.

56.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Statute 18 U.S.C. § 1001;

57.     That, when Defendant Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, willfully and volitionally placed her endorsement on that forged document, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Statute 18 U.S.C. § 1005.

58.     That Debra Lyman, in her affidavit, swore to the court that the original note was filed with the court.

59.     That Debra Lyman, on her behalf, and on behalf of Litton Loan Servicing, RFC Homecomings, GMAC, Washington Mutual Bank, FA, and JP Morgan Chase, caused, or filed with the court a false affidavit.

60.     That because Defendant Litton Loan Servicing, LP, during the course of the litigation fraudulently and falsely held themselves out as servicing agent for Washington Mutual Bank, FA, in an

21

attempt to keep and did obtain a portion of the Plaintiffs insurance proceeds, rendered themselves and their employees agents of an FDIC guaranteed institution and thus liable under the Federal Statutes governing their, and each of their, conduct.

61.    That after the discovery of the purported note after September of 2008, Debra Lyman, on behalf of herself, on behalf of Washington Mutual Bank, FA and their co-conspirators, JPMorgan Chase, GMAC and Litton Loan Servicing, LP, and in furtherance of the conspiracy complained of herein, placed, or caused Cynthia Riley to place, the en blanc endorsement on the forged promissory note.

Pay to the order of

Without Recourse
Washington Mutual Bank, FA

Cynthia A. Riley, Vice President

62.    That, at the time Debra Lyman placed, or caused Cynthia A. Riley, Vice President, to place the stamp, on the forged note, she knew, or reasonably should have known, that the note was a forgery.

63.    That, while all other pages to the document which Cynthia A. Riley placed her stamp, or caused her stamp to be placed on said note, was of an onion skin type paper, the signature page which contained the forged signature, was of a copy type paper, wholly and distinctly different from the remaining pages.

64.    That, the differences in the types of paper, the font, and other apparent differences visible to the naked eye, and apparent to any reasonable person, and clear fact that the last signature page was a copy Debra Lyman clearly knew, or reasonably should have known was a forgery.

22

65.     Further, since the documents on file create a reasonable inference that the signed endorsement in blank or "bearer" endorsement allegedly made by "WASHINGTON MUTUAL BANK, FA By CYNTHIA RILEY VICE PRESIDENT" was placed upon the original note at some point in time after September 8, 2008, and according to the sworn affidavit of Debra Lyman, that all right title and interest in the note transferred to RFC Homecomings, GMAC on March 25, 2005; and Washington Mutual Bank, FA relinquished all of its rights to the Note and Mortgage prior to filing suit; and the seizure of Washington Mutual Bank, FA and the imposition by the Office of Thrift Supervision (now the OCC) of a cease and desist order; her stamp, or her causing of the placing of a Washington Mutual Bank, FA endorsement after the assignment, and cease and desist order, prohibiting any further acts by Washington Mutual Bank, FA whatsoever;  is irrefutable proof and clear and convincing evidence that Washington Mutual Bank, FA's endorsement is unauthorized and Vice President, Cynthia Riley's, signature on the original Note is unauthorized as a matter of law, and clear evidence that the note that was filed by Washington Mutual Bank, FA, Cynthia A. Riley, Debra Lyman, Litton Loan Servicing, GMAC, and RFC Homecomings, was a forgery.

66.     That, at all relevant times herein, Debra Lyman, VP of Litton Loan Servicing, LP, by her representations in her sworn affidavit, falsely authenticated the note by swearing to the court that the note filed with the court was the original note.

67.     That Debra Lyman, VP of Litton Loan Servicing further knew, or reasonably should have known, at the time she signed her affidavit, that Cynthia A. Riley was not authorized to execute any documents, or sign any documents on behalf of Washington Mutual Bank, FA as it was no longer permitted to conduct any business and all assets were transferred to JP Morgan Chase, and thus, any documents executed, if any, should have been executed by JP Morgan Chase.

68.     That because Debra Lyman filed the forged document with the court; or, caused the forged document to be filed with the court, did so as a purported agent or co-conspirator of Washington Mutual

23

Bank, FA or September of 2008, or, thereafter, as a purported agent or co-conspirator of JPMorgan Chase Bank, both FDIC Guaranteed institutions, in furtherance of the conspiracy.

69.     That as a result of being an employee Litton Loan Servicing, as servicing agent of one or more of the banks, GMAC's owner, ALLY Bank, JP Morgan Chase and Washington Mutual Bank, FA, and as a loan servicer, owed fiduciary and other higher duties to the Plaintiffs, and others, and further owed Plaintiffs and others a higher standard of care than a reasonable person standard, a fiduciary standard of care.

70.     That, as a result of that higher fiduciary duty standard, special skill and training, when Defendant Debra Lyman, individually and on behalf of Litton Loan Servicing, LP., presented Cynthia A. Riley with a note, where the first pages were of a wholly and distinctly different kind of onion skin paper than the signature page, and the signature page was of commonly found copy paper, and bore copy marks and lacked other significant and commonly found marks, like the scanner bar mark; she, as a fiduciary, had the special skill, or should have had the special skill and knowledge, to know that the document presented to her for her endorsement was, in fact, a forgery.

71.     That, when Defendant Debra Lyman, individually and on behalf of Litton Loan Servicing, caused Cynthia A. Riley, knowing that the document, or reasonably should have known the document was a forgery, to willfully and volitionally place her endorsement on that forged document, Debra Lyman individually and on behalf of her co-conspirators, furthered the scheme and artifice to defraud the Plaintiffs.

72.     That, after endorsing, or causing to be endorsed with her stamp and signature, the forged note, Debra Lyman used the US Mail or other mail services, to deliver the forged document to the lawyers for Defendant Litton Loan Servicing, Washington Mutual Bank, FA, and JPMorgan Chase.

24

73.     That the forged note and false affidavits and other bills and demands were all mailed across state lines, and Defendant Debra Lyman, on her own behalf, and on behalf of her co-conspirators, used means of interstate commerce, in furtherance of conspiracy of the Defendants, and each of them.

74.     That, when Defendant Debra Lyman, knowing that the purported promissory note, or reasonably should have known the purported note was a forgery, and knew the allegations contained in her affidavit were false, knew she concealed material facts from the court, she willfully and volitionally placed her signature on that false affidavit.

75.     Debra Lyman committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et. seq.;

76.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.;

77.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the 18 U.S.C. 1964, (Civil Rico Remedies).

78.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Mail and Wire Fraud 18 U.S.C., sections 1341, 1343.

25

79.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the bank fraud statutes, 18 U.S.C. 1341, 1344.

80.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Statute 18 U.S.C. § 1001;

81.     That, when Debra Lyman, knowing that the document, or reasonably should have known the affidavit was false and concealed material facts from the court, she committed, and acted to further the conspiracy with Litton Loan Servicing, JPMorgan Chase, Washington Mutual Bank, FA and RFC Homecomings to assist Litton in their violations of the Statute 18 U.S.C. § 1005.

82.     On January 18, 2011, VP and Assistant General Counsel at JP Morgan Chase after being apprised of all the facts, and conducting her own thorough investigation on behalf of JP Morgan Chase, ratified in writing, all the wrongful conduct of the defendants, and each of them, thereby accepting full responsibility for all the negligent, malicious, illegal, intentional, wanton and willful conduct, all on behalf of Defendant JP Morgan Chase.

83.     On or about July 28, 2011, Defendant Stephanie Jackson, an employee in the Chase Home Lending Executive Offices, during the course of an official investigation by the OCC, then provided false information and made false statements to the OCC in the hopes that the OCC would discontinue their investigation against CHASE.

84.     Defendant ALLY FINANICAL INC., which wholly owns GMAC Mortgage's, individually and dba (DEFENDANT) RFC HOMECOMINGS, LITTON LOAN SERVICING, LP, Defendant WASHINGTON MUTUAL BANK, FA, Defendant JP MORGAN CHASE, officious intermeddling,

26

intentional interference, filing of false affidavits, and forged promissory note and obtaining a fraudulent judgment of foreclosure on the property owned by the Plaintiffs at 3122 Pine Tree Drive, in Miami Beach, Florida, 33140; then, the subsequent concealment of their wrongful conduct by lying to government officials, and providing them with knowingly false information; including, but not limited to, providing false information to the Office of the Comptroller of the Currency (OCC) during their official investigation.

85.     At various times and places partially enumerated in Plaintiff's documentary material, all Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a RICO enterprise of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b).

86.     The illegal acts complained of by the Plaintiff, and committed by the Defendants, and their co-conspirators, include, but are not limited to the following violations of State and Federal Law:

a.     Acquisition and Maintenance of an Interest in and Control of an illegal Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b) (Prohibited activities)

b.     Conduct and Participation in a RICO Enterprise through a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(c)

c.     Conspiracy to Engage in a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(d)

d.     Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

e.     Bank Fraud 18 U.S.C. 1341, 1344;

f.     Violations of 18 U.S.C. § 1001;

g.     Violations of 18 U.S.C. § 1005;

h.     Violations of HAMP;

i.     Violations of 12 C.F.R. §202.16 ; Violations of REGULATION B

27

j.      Willful violation of Florida Statute 701.04(1), demand for estoppel.

k.      Willful violation of the September 1, 2011 agreement with New York's Department of Financial Services and Banking Department.

I.      <u>**JURISDICTION AND VENUE**</u>

87.      This is a complaint is for damages and other relief, under the Federal Fair Debt Collection Practices Act, ("FDCPA"), 15 U.S.C. § 1692 ET. SEQ.; Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) <u>18 U.S.C. 1961</u> et seq.; <u>18 U.S.C. 1964</u>, (Civil RICO Remedies); Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343; Bank Fraud 18 U.S.C. 1341, 1344; Violation of 18 U.S.C. § 1001; Violation of 18 U.S.C. § 1005; Violation of HOME AFFORDABILITY MODIFICATION PROGRAM (HAMP); Violation of 12 C.F.R. §202.16, Regulation B; Declaratory Relief and Damages Pursuant to Florida Statute Chapter 701.04 (1).

88.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction over the state law claims because Plaintiff's state law claims are so related to Plaintiff's federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

89.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 as Plaintiffs reside and the violations discussed herein occurred in Miami Dade County, Florida.

90.      This Court further has Diversity Jurisdiction pursuant to 28 U.S.C. § 1332 (a) (1).

a.      Plaintiffs reside in the County of Miami Dade, in the State of Florida;

b.      Defendant ALLY FINANICAL INC., a Delaware corporation, with a principal place of business at 200 Renaissance Center, P.O. Box 200 Detroit, Michigan 48265-2000 which wholly owns GMAC Mortgage, formerly known as GMAC Mortgage Corporation, is a Delaware limited liability company with a principal place of business in Fort Washington, Pennsylvania;

28

   c.  Defendant RFC Homecomings is a wholly owned subsidiary of Defendant GMAC Mortgage Corporation, a Delaware Limited Liability Company;

   d.  Defendant JPMorgan Chase is a Delaware Corporation with its principal place of business in New York.

   e.  Defendant Litton Loan Servicing, LP is formed and its principal place of business is in Texas;

   f.  Plaintiffs are informed, believe, and thereon allege that Defendant Debra Lyman is a resident of the State of Texas;

   g.  Plaintiffs are informed, believe, and thereon allege that Defendant Washington Mutual Bank, FA was a Washington Corporation whose assets were seized by the OTS, and the Receiver sold the assets to Defendant JPMorgan Chase.  Defendant, Washington Mutual Bank, FA has produced discovery showing Plaintiff does not owe Washington Mutual Bank, FA any sum, but as a result of fraud perpetrated on the court, Washington Mutual Bank obtained a fraudulent judgment of foreclosure against the Plaintiffs;

   h.  Plaintiffs are informed, believe, and thereon allege that Defendant Stephanie Jackson is a resident of South Carolina; and

   i.  The amount in controversy exceeds the sum of $75,000.

   j.  Defendant Ocwen Loan Services, LLC.,

## II. COUNTS (BY DEFENDANTS)

**COUNT ONE**:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Failure Of Litton Loan Service To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

29

91.     Plaintiffs incorporate paragraphs 1 to 90, inclusive, herein, as though set forth herein in full.

92.     The Making Home Affordable Program was introduced in February 2009 by the Obama Administration which was intended to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure.

93.     Because the stated purpose of the program was partly designed to help homeowners, homeowners, including the Plaintiffs, were the intended third party beneficiaries of the Program.

94.     In March of 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry, and updated those guidelines with policy announcements.

95.     The MHA Handbook for Servicers of Non-GSE Mortgages (Handbook) was issued to provide guidance for servicers of mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac.

96.     On Thursday, August 6, 2009, Litton Loan Servicing, LLC (Litton) became the 40TH participant in the Home Affordable Modification Program (HAMP), by signing the Servicer Participation Agreement (SPA).

97.     Litton registered and executed a Servicer Participation Agreement, related documents, and one or more Service Schedules (SPA) with the Program Administrator on or before October 3, 2010.

98.     The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

99.     Litton Loan Servicing, LP agreed to abide by the terms of the handbook as part of the Servicer Participation Agreement (SPA).

100.    All participating servicers, including Litton, are required, among other things, to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. MHA 1.1

      a.     Pursuant to the Handbook, Litton cannot escape liability by simply referring the matter to their lawyers.

30

   b.      The Handbook, in pertinent part says that if the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA.

   c.      Litton has instructed Akerman Senterfitt, its lawyers to act on their behalf, and thus Litton is responsible for all the willful violations, intentional and negligent misconduct of its lawyers and co-conspirators as pled herein, in failing in every respect to meet the requirements of HAMP.

   d.      All of the wrongdoings complained of herein, include the conduct of Akerman Senterfitt as the agent and subcontractor of Litton.

   101.    As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA. MHA 1.1

   102.    In 2009, Congress passed the Helping Families Save Their Homes Act of 2009, which includes legal protection for servicers that modify residential mortgages.

   103.    It was intended to encourage more servicers to modify more mortgages for the benefit of the homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

   104.    The bill essentially provides authority for, and legal protection for servicers to alter mortgage contracts and, as the argument goes, investor contracts where mortgages have been securitized.

   105.    Thus, not only does no legal impediment existed for Litton Loan Servicing LLC to grant a loan modification to any and all individuals who qualify, but also every action taken by the Government was intended to benefit the Homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

   106.    In addition to the normal obligation to obey all laws, and the implied covenants of good faith and fair dealing that are found in every contractual agreement, the SPA requires that Litton Loan Servicing fully comply with all federal, state, and local laws, including statutes, regulations, ordinances,

31

administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP.

        a.      Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

        b.      The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

        c.      The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

        d.      The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

        e.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

        f.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

        g.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act.

        h.      Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies);

        i.      Conspiracy to commit and commission of Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

        j.      Conspiracy to commit and commission of Bank Fraud 18 U.S.C. 1341, 1344;

32

k.    Conspiracy to commit and commission of 18 U.S.C. § 1001;

l.    Conspiracy to commit and commission of 18 U.S.C. § 1005;

107.    The Plaintiff's property would have been qualified under the conditions required of HAMP, and the Plaintiff would have been eligible for HAMP, including, but not limited to, the following conditions:

a.    Mortgage loan was originated on or before January 1, 2009;

b.    Mortgage loan was not previously modified under HAMP.

c.    The Mortgage loan is delinquent or default is reasonably foreseeable.

d.    The Mortgage loan is secured by a one unit property, which is the principal residence of the Plaintiff.

e.    The subject property is not vacant or condemned.

f.    The borrower has documented financial hardship and represented she does not have sufficient liquid assets to make the monthly mortgage payments because of a reduction in her salary and a reduction in her spouses work to part time status.

g.    The Plaintiff's monthly mortgage payment (including principal, interest, taxes, and insurance) is greater than 31 percent of the Plaintiff's verified monthly gross income.

h.    The Plaintiff is willing to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

i.    The Current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than $729,750.

j.    The Plaintiff offered to make a timely first trial period payment on or before December 31, 2012, but no TPP was ever offered to the Plaintiff.

k.    The Plaintiff is in active litigation, and is eligible for HAMP.

33

108.    Litton was required to communicate with clear written information designed to help the borrower understand the modification process in accordance with the HAMP guidelines and Handbook.

109.    Litton has failed and refused to communicate with the Plaintiff, and referred the Plaintiff to their attorney, who has also refused to provide any information regarding HAMP; expressly, blatantly and openly refused to comply with the statutory requirements of providing an estoppel letter; and has willfully violated every provision of the HAMP and the handbook.

110.    Although Litton has a toll free number, the Plaintiff was told he was not allowed to call Litton; not allowed to discuss HAMP with Litton; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with Litton.

111.    Litton is required to maintain adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

112.    Litton has refused to acknowledge receipt of Plaintiffs HAMP application; refused to respond to the application; refused to discuss the application with Plaintiff; and willfully violated the following regulations:

113.    Although Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, used false affidavits; filed a forged promissory note; committed perjury and numerous acts of fraud upon the court and the Plaintiff in order to obtain a judgment of foreclosure.

114.    Although the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibits discrimination on a prohibited basis in connection with mortgage transactions, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants discriminated against the Plaintiff because of her gender and her religion.

34

115. Although the Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants failed to provide proper documentation in violation of RESPA.

116. Although the Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants tendered multiple demands seeking payment on behalf of RFC Homecomings, but obtained a judgment in the name of Washington Mutual Bank, FA, informing the court that the only entity entitled to recover was Washington Mutual Bank, FA. Each letter and piece of correspondence sent on behalf of RFC Homecomings was a separate violation of the Fair Debt Collection Practices Act.

117. Although the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification, (these laws also prohibit red-lining), Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants has discriminated against the Plaintiffs on the basis of her gender and her religion.

118. Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants negotiated modifications of loans with others, but refused to even consider the Plaintiffs, failing to acknowledge or respond to the Plaintiffs application.

119. Although he Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants used false information in reporting consumer credit information to credit reporting agencies about the Plaintiff.

35

120.    Although the Regulation B, which states that a borrower who applies for, and is denied, a

loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity

Act Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally and

willfully failed and refused to comply with Regulation B by failing to timely respond to the HAMP

application, thus violating Regulation B.

121.    Under Florida Law, Litton Loan Services, LP, on their own behalf, and on behalf of the co-

defendants, was required to provide an estoppel letter pursuant to Florida Statutes Chapter 701.04 (1), which

says, in pertinent part:

> "Within 14 days after receipt of the written request of a mortgagor, the holder
> of a mortgage shall deliver to the mortgagor at a place designated in the
> written request an estoppel letter setting forth the unpaid balance of the loan
> secured by the mortgage, including principal, interest, and any other charges
> properly due under or secured by the mortgage and interest on a per-day basis
> for the unpaid balance. Whenever the amount of money due on any mortgage,
> lien, or judgment shall be fully paid to the person or party entitled to the
> payment thereof, the mortgagee, creditor, or assignee, or the attorney of
> record in the case of a judgment, to whom such payment shall have been
> made, shall execute in writing an instrument acknowledging satisfaction of
> said mortgage, lien, or judgment and have the same acknowledged, or proven,
> and duly entered of record in the book provided by law for such purposes in
> the proper county. Within 60 days of the date of receipt of the full payment of
> the mortgage, lien, or judgment, the person required to acknowledge
> satisfaction of the mortgage, lien, or judgment shall send or cause to be sent
> the recorded satisfaction to the person who has made the full payment. In the
> case of a civil action arising out of the provisions of this section, the
> prevailing party shall be entitled to attorney's fees and costs."

122.    Proper demand was made upon Litton Loan Services, LP, on their own behalf, and on behalf

of the co-defendant, Washington Mutual Bank, FA, on 10/28/2010 pursuant to said statute to provide

Plaintiff with an estoppel letter.

123.    On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter

stating unequivocally that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants

36

received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

124.    That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law, as well as a direct violation of the requirement of the HAMP guidelines wherein "the SPA requires that Litton Loan Servicing fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

125.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, pursuant to the HAMP guidelines, is required to make a reasonable effort to solicit borrower by performing at a minimum, the following acts:

a.    The servicer is to make a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; -  (Litton made none) and

b.    The servicer is to send two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail.  (Litton's only correspondence was the bad faith demand letters, never any response or mention of the HAMP or other rights of the Borrower).

c.    Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

1.    Advise borrowers that they may be eligible for HAMP; MHA Handbook v 2.0.  (Litton made no such effort nor provide no such advice).

2.    Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;  (Litton never discussed HAMP, refused to discuss HAMP with the Plaintiffs, and never reviewed the Plaintiffs application.)

37

        3.      Provide a toll-free telephone number through which the borrower can reach a loan servicer representative; (Litton stated that Plaintiff is not permitted to call them at all) and

        4.      Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date.  (Litton refused to provide any information regarding HAMP or mention the application whatsoever).

        5.      All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, resolicitation of the borrower is not required. (If Litton documented any efforts, then they would be fraudulent and further violations of the Agreement.)

126.   Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants failed to make ANY contact with the Plaintiff; refused to discuss the matter with the Plaintiff; refused to provide a number for the Plaintiff to discuss the matter with the Servicer; and refused to comply with all the requirements set forth in 20.

127.   Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants was further required to, and willfully failed and refused to comply with each and every one of the following conditions:

        a.      The servicer must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.

        b.      The communication should:

        1.      Describe the income evidence required to be evaluated for HAMP;

        c.      Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

        d.      Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

38

e.      The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

f.      If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the servicer must continue to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

g.      If Right Party Contact is established, but the borrower does not submit an Initial Package, the servicer must resend the Initial Package communication.  Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication.  If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

h.      If Right Party Contact is established, but the borrower submits an incomplete Initial Package within the required time period, the servicer must comply with the "Incomplete Information Notice" requirements set forth below in Section 2.3.3.  If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing an Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

Servicers must acknowledge receipt of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in Section 2.3.2).

39

128. Pursuant to the provisions of the agreement, Plaintiffs are entitled to a stay as Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants failed in every respect to meet the provisions of the SPA.

129. Pursuant to the provisions of the SPA, Litton intentionally and willfully failed to comply with each and every provision as set forth below:

3 Protections Against Unnecessary Foreclosure
3.1 Suspension of a Referral to Foreclosure
A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:
- The borrower is evaluated for HAMP and is determined to be ineligible for the program;
or
- The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or
- The servicer has established Right Party Contact, has sent at least two written requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests;                    or
- The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer in its servicing system and/or mortgage file.
3.2 Suspension of Foreclosure Proceedings in Process
With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP based on verified income, and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered.
3.3 Suspension of Scheduled Foreclosure Sale
When a borrower submits a request for HAMP consideration after a foreclosure sale date has been scheduled and the request is received no later than midnight of the seventh business day prior to the foreclosure sale date (Deadline), the servicer must suspend the sale as necessary to evaluate the borrower for HAMP…
3.4 Mitigating Foreclosure Impact
The servicer must take the following actions to mitigate foreclosure impact:
3.4.1 Simultaneous Trial Period Plan and Foreclosure Explanation
When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a TPP, the servicer must provide the borrower with a written notification that explains, in clear language, the concurrent modification and foreclosure processes and that states that even though certain foreclosure activities may continue, the home will not be sold

40

at a foreclosure sale while the borrower is being considered for HAMP or while the borrower is making payments under a TPP…

3.4.2   Foreclosure Attorney/Trustee Communication

Servicers must develop and implement written policies and procedures to provide notification to their foreclosure attorney/trustee regarding a borrower's HAMP status, including whether the borrower is potentially eligible for HAMP (and is subject to Section 2.2), and whether the borrower is being evaluated for, or is currently in, a TPP.  Servicers must ensure that their foreclosure attorney/trustee adheres to all of the requirements of Section 3.1, Section 3.2 and Section 3.3 with respect to referral to foreclosure, stay of foreclosure actions and suspension of foreclosure sales.

3.4.3   Certification Prior to Foreclosure Sale

Servicers must develop and implement written procedures applicable to all loans that are potentially eligible for HAMP (and are subject to Section 2.2) that require the servicer to provide to the foreclosure attorney/trustee a written certification that (i) one of the five circumstances under Section 3.1 exists, and (ii) all other available loss mitigation alternatives have been exhausted and a non-foreclosure outcome could not be reached.  This certification must be provided no sooner than seven business days prior to the scheduled foreclosure sale date (the Deadline) or any extension thereof.

130.    Plaintiffs were further entitled, and never received the required acknowledgement of the

Initial Package.

4.5 Acknowledgment of Initial Package
Within 10 business days following receipt of an Initial Package, the servicer **must** acknowledge in writing the borrower's request for HAMP participation by sending the borrower confirmation that the Initial Package was received and a description of the servicer's evaluation process and timeline. If the Initial Package is received from the borrower via email, the servicer may email the acknowledgment.  Servicers must maintain evidence of the date of receipt of the borrower's Initial Package in its records.
A single written communication sent within 10 business days of receipt of a borrower's request for HAMP participation may also include, at the servicer's discretion, the results of its review of the Initial Package.

131.    Although Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants

**MUST** comply, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants not only

failed to acknowledge their receipt of the Initial Package that was sent to them and received on May 4,

2011, but wantonly, willfully and intentionally failed and refused in every respect to comply with any of the

provisions of HAMP contained herein for the benefit of the Plaintiff.

41

132.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants was obligated to review the documentation submitted by Plaintiff on May 4, 2011, within 30 days, and failed and refused to do so.

133.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants had 30 days wherein they were contractually obligated to review the initial package, and they willfully, wantonly and intentionally failed and refused in every respect to do so.

>    4.6 Review of Initial Package
>    Within 30 calendar days from the date an Initial Package is received, the servicer **must** review the documentation provided by the borrower for completeness.  If the documentation is incomplete or insufficient for use in underwriting, the servicer must send the borrower an Incomplete Information Notice in accordance with the guidance set forth in Section 2.3.3.
>    If the borrower's documentation is complete, the servicer must evaluate the borrower's eligibility for HAMP and either:
>    -    Send the borrower a TPP Notice (see Section 8.1); or
>    -    Make a determination that the borrower is not eligible for HAMP and communicate this determination to the borrower in accordance with the guidance in Section 2.3.2.

134.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants had only 30 days from May 11, 2011 to wherein they were contractually obligated to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination, and utterly, willfully, wantonly, and intentionally failed and refused to do so.

135.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants had 30 days from May 11, 2011 wherein they were contractually obligated to provide the Plaintiff with a determination, and willfully, wantonly, and intentionally failed and refused to do so in breach of that agreement.

>    6 Underwriting
>    Servicers must determine the borrower's eligibility for a modification using information obtained in the Initial Package and subsequently verified. **Servicers are required** to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination within 30 calendar days of receiving all required borrower documentation.

42

136.    Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants was contractually obligated to consider the Plaintiff for Hope for Homeowners, and utterly failed and refused to do so.

137.    Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants was contractually obligated to consider the Plaintiff for Hope for Homeowners, as set forth herein.

> 6.2 Coordination with Hope for Homeowners
> Servicers are **required** to consider a borrower for a refinance through the Federal Housing Administration's HOPE for Homeowners (H4H) program when feasible.  Consideration for an H4H refinance should not delay eligible borrowers from receiving a TPP Notice.  The servicer's obligation as it relates to the H4H requirement is that while the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through H4H. This assessment would involve asking the following set of questions:
> -        Will the loan amount exceed $550,440?  No.
> -        Has the borrower made less than six (6) full payments during the life of the first lien loan?  No.
> -        Does the borrower have an ownership interest in other residential real estate, including any second homes or rental properties?  No.
> -        Was the mortgage to be refinanced originated after January 1, 2008? No.
> -        Does the property contain more than one (1) unit?  No.
> If the answer to all of these questions is "NO", the borrower may be eligible for H4H. (As is the precise case for the Plaintiff, herein). In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender.

138.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants failed and refused to notify the Plaintiff of their consideration, as well as Litton failed and refused to consider the Plaintiff, entitlement to relief under Hope for Homeowners.

139.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants was obligated to apply the modification steps until the monthly mortgage payment ratio is reduced to 31 percent, but utterly failed and refused to do so.

43

140.    Pursuant to the Handbook, section 6.3 Standard Modification Waterfall Servicers **must** apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).

141.    A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

142.    Even though clearly, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, **MUST** have taken action, they failed and intentionally refused to comply with every requirement of HAMP; failed and refused to comply with State and Federal Law; committed fraud; willfully and maliciously acted with the sole intent to deprive Plaintiffs of their property.

143.    Because there existed a contract between Litton Loan Servicing, LP and the US Treasury Department which was intended to benefit the Plaintiffs, and others similarly situated; and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants accepted consideration for each loan modification application from the US Treasury Department; because there was a mutual intent to benefit the Plaintiffs, and others similarly situated; and the Plaintiffs were deprived of their opportunity to have their HAMP application, their H4H application properly and timely reviewed, the Plaintiffs suffered irreparable harm.

144.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants further owed the Plaintiffs and others similarly situated the implied obligations of good faith and fair dealing, which covenants are implied in every contract.

44

145.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants committed intentional, wanton and willful breaches of the covenants of good faith and fair dealing; intentional, wanton and willful breaches of the agreement with the US Treasury Department; and the Plaintiffs, and others similarly situated were the intended third party beneficiaries of that agreement between Litton Loan Servicing, LP and were harmed as a result of those breaches.

146.    Plaintiffs are entitled to receive compensatory damages according to proof;

147.    Plaintiffs are entitled to receive exemplary damages based on the net worth of Litton Loan Servicing, LP for their malicious, wanton and willful breaches of the agreement.

148.    Wherefore Plaintiffs respectfully request that the court:

A.    Issue an order requiring Litton Loan Services, LP, on their own behalf, on behalf of each of the co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiffs and dismiss them with prejudice;

B.    Find that Litton Loan Services, LP, on their own behalf, and on behalf of each of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.    Find that Litton Loan Services, LP, on their own behalf, and on behalf of each of the co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly and maliciously violated the requirements of HAMP when they intentionally, willfully, wantonly and maliciously violated the following laws, ordinances and provisions:

1.    Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

45

2.      The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

3.      The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

4.      The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

5.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

6.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

7.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

8.      Intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

D.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

E.      Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Equal Credit Opportunity Act

46

(ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

   F. Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

   G. Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

   H. Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

   I. Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

   J. Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act; and

47

K.     Find that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentionally, willfully, wantonly, and maliciously violated Florida Statute 701.04(1).

L.     That the court further grant compensatory damages to Plaintiffs for Litton Loan Servicing LPs' intentional, willful, wanton, and malicious violations as complained of herein in an amount according to proof, but not less than one million four hundred thousand dollars;

M.     That the court further grant punitive damages to Plaintiff against Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants for Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants intentional, willful, wanton, and malicious violations of statute in an amount comparative the net worth of the Defendant such that Defendant Litton Loan Services, LP, will be punished, will not commit further acts against other similarly situated Plaintiffs;

N.     That the court further grant statutory damages of $10,000 per violation, to Plaintiff against Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants for their intentional, willful, wanton, and malicious violations of Regulation B in an amount comparative the net worth of the Defendant such that Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants will be punished, will not commit further acts against other similarly situated Plaintiffs in an amount according to proof;

O.     That the court order Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, be ordered to pay reasonable attorney's fees, court costs, and the attorney's fees incurred by Plaintiffs in defending against the fraudulent and malicious acts of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants in their filing false affidavits and fraudulent promissory notes in a State Court Foreclosure Action against the Plaintiffs, and other reasonable costs to the Plaintiff in an amount according to proof; and

48

P.    That the court grants to Plaintiff against the Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, such other and further legal and equitable relief that it deems fair and just.

## COUNT TWO:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the FEDERAL FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA") 15 U.S.C. § 1692 ET. SEQ

149.    Plaintiffs incorporate paragraphs 1 to 148, inclusive, herein, as though set forth herein in full.

150.    Plaintiffs fall within the class of individuals who are defined by the Statute as consumer—"any natural person obligated or allegedly obligated to pay any debt".

151.    Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, claims that Plaintiffs owed a consumer debt—"any obligation... [I [incurred] primarily for personal, family or household purposes", a mortgage secured by a forged note and deed of trust.

152.    Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants is a debt collector—any person using interstate commerce who regularly collects debts as defined by the statute and as proven by their acts alleged herein.

153.    Each separate letter demanding payment, including billing the Plaintiffs for attorneys' fees and court costs, inspection fees, and all demands for money of any and all kinds, sent by, or demanded on the behalf of Litton Loan Servicing, LP individually, and on behalf of Defendant RFC Homecomings and GMAC is a separate violation of the FDCPA.

154.    Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

49

    c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan

Services, LP, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from

any further breaches of the statute;

    d.      Reasonable attorney's fees and court costs according to proof;

    e.      Such other and further relief as the court deems just and proper.

<u>**COUNT THREE**</u>:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Damages And Declaratory Relief Action For Litton Loan Service's Acquisition and Maintenance of an
Interest in and Control of an Enterprise Engaged in a Pattern of Racketeering Activity pursuant to 18
U.S.C. §§ <u>1961</u>(1)(A) and (B), and did so in violation of the RICO law at <u>18 U.S.C. 1962</u>(b) and
18 U.S.C. §§ 1964, (Prohibited activities)
(Civil RICO Remedies)

155.    Plaintiffs incorporate paragraphs 1 to 154, inclusive, herein, as though set forth herein in full.

Substance prevails over form.

156.    Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as

though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as

prohibited by RICO. Substance prevails over form.

157.    On March 25, 2005, and continuing, through the present, all Defendants did cooperate jointly

and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO

laws at 18 U.S.C. §§ <u>1961</u>(1)(A) and (B), and did so in violation of the RICO law at <u>18 U.S.C. 1962</u>(b)

(Prohibited activities).

158.    Plaintiffs further allege that Defendant Litton Loan Services, LP, on their own behalf, and on

behalf of the co-defendants, in conjunction with and in furtherance of the conspiracy with all the remaining

Defendants, did commit two (2) or more of the offenses itemized above in a manner which they calculated

and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering

activities, also in violation of the RICO law at <u>18 U.S.C. 1962</u>(b) supra.

50

159.   Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.

160.   Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise). Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, are liable for all wrongful conduct of its co-defendants, and each of them, its lawyers, Shapiro and Fishman and Akerman Senterfitt.

161.   At all times herein, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, and each of them, conspired with remaining defendants, to interfere with the quiet enjoyment of Plaintiffs home; steal the equity in the Plaintiff's home; and used a forged promissory note and fraudulent affidavit in a civil court action in order to fraudulently obtain a judgment of foreclosure. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.     Statutory Compensatory damages for each separate violation according to proof;

      b.     Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants;

      c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.     Reasonable attorney's fees and court costs according to proof;

      e.     Such other and further relief as the court deems just and proper.

## COUNT FOUR:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Conduct and Participation in a RICO Enterprise
through a Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(c)

162.   Plaintiffs incorporate paragraphs 1 to 161, inclusive, herein, as though set forth herein in full. Substance prevails over form.

51

163.    Plaintiffs further incorporate the allegations of the remaining Counts of the rest of this complaint, contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

164.    At various times and places partially enumerated Plaintiff's documentary material, all Defendants, and each of them, did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

165.    Likewise, all Defendants, and each of them, did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

166.    During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

167.    Plaintiffs further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

168.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior. Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.    Statutory Compensatory damages for each separate violation according to proof;

      b.    Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

52

c. Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d. Reasonable attorney's fees and court costs according to proof;

e. Such other and further relief as the court deems just and proper.

**COUNT FIVE**:
**PLAINTIFFS v. LITTON LOAN SERVICING, LP**

Conspiracy to Engage in a
Pattern of Racketeering Activity:
18 U.S.C. §§ 1961(5), 1962(d)

169. Plaintiffs incorporate paragraphs 1 to 168, inclusive, herein, as though set forth herein in full. Substance prevails over form.

170. Plaintiffs further incorporate the allegations of the remaining Counts contained herein, as though set forth herein in full as further proof of the conspiracy and pattern of racketeering activity as prohibited by RICO. Substance prevails over form.

171. At various times and places as enumerated in Plaintiff's exhibits which are attached hereto, and incorporated herein, all Defendants, and each of them, did conspire to acquire and maintain an interest in a RICO enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(b) and (d).

172. At various times and places partially enumerated in Plaintiff's documentary material, all Defendants, individually and on behalf of each other, committed acts in furtherance of the conspiracy, did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

173. During the six (6) calendar years preceding the filing of this complaint, all Defendants, and each of them, did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d).

53

174.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses

itemized above in a manner which they calculated and premeditated intentionally to threaten

continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C.

1962(d) (Prohibited activities supra).

175.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws herein are to

be liberally construed by this honorable Court and the claim is based on the theory of Respondeat Superior.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.    Statutory Compensatory damages for each separate violation according to proof;

b.    Exemplary damages for each separate violation based on the net worth of the Defendant,

Litton Loan Servicing, LP;

c.    Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing,

or any of their agents or assigns, from any further breaches of the statute;

d.    Reasonable attorney's fees and court costs according to proof;

e.    Such other and further relief as the court deems just and proper.

### COUNT SIX:
### PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the MAIL AND WIRE
FRAUD 18 U.S.C., SECTIONS 1341, 1343

176.    Plaintiffs incorporate paragraphs 1 to 175, inclusive, herein, as though set forth herein in full.

Substance prevails over form.

177.    As alleged herein, Defendant Litton Loan Services, LP, on their own behalf, and on behalf of

the co-defendants, committed numerous of acts of mail fraud, which is a violation of federal law.

178.    That Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-

defendants, knowingly devised a scheme to defraud or to obtain money or property (or the intangible right

54

of honest services) by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

179.    That Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, acted with the intent to defraud the Plaintiffs and others (including the US Treasury) to the detriment of the Plaintiffs, and each of them.

180.    That in advancing, furthering, or carrying out the scheme, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, used the mails (a private or commercial interstate carrier), or caused the mails (a private or commercial interstate carrier) to be used.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.      Statutory Compensatory damages for each separate violation according to proof;

b.      Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, or any of their agents or assigns, from any further breaches of the statute;

d.      Reasonable attorney's fees and court costs according to proof;

e.      Such other and further relief as the court deems just and proper.

## COUNT SEVEN:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
VIOLATION OF 18 U.S.C. § 1001

181.    Plaintiffs incorporate paragraphs 1 to 180, inclusive, herein, as though set forth herein in full. Substance prevails over form.

55

182.     Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, violated 18 U.S.C. § 1001 by the conduct complained of herein, and as proven at the time of trial.

183.     Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants falsified, concealed or covered up by any trick, scheme or device, material facts, including, but not necessarily limited to:

          a.     The date of the transfer of the loan from Washington Mutual Bank, FA;

          b.     The use of false and misleading language in the affidavit of Debra Lyman.

> 5.     On March 25, 2005, subsequent to the filing of the foreclosure complaint, the loan was transferred from Washington Mutual to RFC. All rights under the note and mortgage were transferred at that time.

          c.     The true facts were, that March 25, 2005 is five days prior to the filing of the lawsuit. The court was misled by Defendant Washington Mutual Bank, FA, Defendant Debra Lyman, Defendant Litton Loan Servicing LP's use of the misleading words "subsequent to the filing of the foreclosure complaint". Had each of the Defendants informed the court of the true facts, that March 25, 2005, was five days prior to suit being filed, then Washington Mutual Bank, FA would have had no standing to bring the action, and thus the action would have been dismissed.

          d.     The Defendant's affidavit was further false in that it claimed Washington Mutual Bank, FA, was entitled to sums that Washington Mutual Bank, FA later admitted were neither due nor owing to them.

          e.     In fact, Defendants concealed from the court and failed to inform the court of a credit of $373,907.18 in principal, proving that Washington Mutual Bank, FA, was paid in full and not owed any money from the Plaintiffs.

56

f.      The Defendants, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, filed false affidavits with the court in order to obtain a judgment of foreclosure.

g.      The Defendants, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants also filed a fraudulent affidavit.

h.      The Defendants, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants violated the State and Federal Statutes listed herein and committed other wrongful and intentional misconduct, all according to proof as pled herein.

184.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001 by their made, and / or caused to be made fictitious or fraudulent statements or representations to the Plaintiffs, to the court, and to the US Department of the Treasury; to the OCC; to the FTC; to the State and local authorities, and to the court of appeals.

185.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001by making or using any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, all as alleged herein.

186.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants further violated 18 U.S.C § 1001, as alleged herein, because the statements made by the Defendant, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants were all material, and adversely affected the Plaintiffs, the court, the US Government, and others.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.      Statutory Compensatory damages for each separate violation according to proof;

b.      Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

57

d.      Reasonable attorney's fees and court costs according to proof;

e.      Such other and further relief as the court deems just and proper.

## COUNT EIGHT:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action for Litton Loan Service's Violation of
18 U.S.C. § 1005

187.    Plaintiffs incorporate paragraphs 1 to 186, inclusive, herein, as though set forth herein in full.
Substance prevails over form.

188.    Defendant Stephanie Jackson, in furtherance of the co-conspiracies complained of herein,
and in order to conceal and misdirect the officials conducting an official investigation, provided false
information to the OCC, delivered by means of the US Mail, and across State lines.

189.    The defendant Stephanie Jackson knew that the OCC was conducting a full investigation of
the conduct of JPMorgan Chase, the fraudulent affidavit of Debra Lyman and Litton Loan Services, LP, on
their own behalf, and on behalf of the co-defendants and the use of a forged promissory note in obtaining a
fraudulent judgment of foreclosure.

190.    During that investigation stemming from a complaint filed on November 4, 2010, the OCC
sent a request for a response from Chase on November 22, 2010, and replied to by Stephanie Jackson on
July 28, 2011.

191.    That letter, dated July 28, 2011 delivered by means of the US Mail, and across State lines,
contained numerous lies to the Federal Government with the intention of having the Federal Government
cease any further investigation, including the false statement that their name was removed from the lawsuit
as a result of the sale of the loan on April 19, 2005 (contrary to the date of March 25, 2005) that Debra
Lyman, VP of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants swore to in
her affidavit to the court.

58

192.    The facts are that the name on the action never changed, and the date sold contradicts the sworn testimony of Debra Lyman of Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants.

193.    The Defendant, Stephanie Jackson, therefore conspired with Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, with the remaining Defendants conspired to, and did falsify information and create false entries in the books and records of JPMorgan Chase Bank with the intent to injure, and defraud the bank, and defraud the Plaintiffs, the courts and the OCC.

194.    In the letter of July 28, 2011, delivered by means of the US Mail, and across State lines, the attorneys for JPMorgan Chase, Shapiro and Fishman, also lied to JPMorgan Chase and entered, or caused to be entered, false information into the records of the Bank, with the intention of defrauding the Plaintiffs, the OCC and JPMorgan Chase.

195.    Plaintiffs are informed, believe, and thereon allege, and have incorporated herein, that other false and misleading statements were entered into the books and records of the bank, JP Morgan Chase, Washington Mutual Bank, FA's, and GMAC's Ally Bank, with the intent to defraud the Banks, the Plaintiff, and different branches of the Federal Government, all in violation of the above-stated statute.

196.    Said false and malicious statements and false entries were designed to, and intended to injure or defraud such banks, and other company, body politic or corporate, and individual person, including the Plaintiffs, and to deceive the officer of such bank, company, branch, agency, or organization, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, company, branch, agency, or organization, or the Board of Governors of the Federal Reserve System.

197.    Further, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, in concert with, and with the intent to defraud the United States or any agency thereof, or any financial institution referred to in this complaint, participated and shared in and or received (directly or indirectly)

59

any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution, and should be fined not more than $1,000,000 or imprisoned not more than 30 years, or both pursuant to code.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

      a.      Statutory Compensatory damages for each separate violation according to proof;

      b.      Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

      c.      Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

      d.      Reasonable attorney's fees and court costs according to proof;

      e.      Such other and further relief as the court deems just and proper.

## COUNT NINE:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
EQUAL OPPORTUNITY ACT
VIOLATION OF 12 C.F.R. §202.16
REGULATION B

      198.    Plaintiffs incorporate paragraphs 1 to 197, inclusive, herein, as though set forth herein in full. Substance prevails over form.

      199.    Regulation B notice is required when the Defendant, Litton Loan Servicing, LP, failed to acknowledge receipt of the HAMP application, thus constituting a denial of the application and denial of credit there under.

      200.    Pursuant to Regulation B, any denial of credit required Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, to tender a proper notice pursuant to that Regulation B.

60

201.     Each separate act by Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, constituted separate violations of the statutes as alleged in this entire Complaint constitutes grounds for statutory damages payable to the Plaintiffs in the sum of $10,000 per violation, according to proof.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

a.     Statutory Compensatory damages for each separate violation according to proof;

b.     Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP;

c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

d.     Reasonable attorney's fees and court costs according to proof;

e.     Such other and further relief as the court deems just and proper.

## COUNT TEN:
## PLAINTIFFS v. LITTON LOAN SERVICING, LP

PENDANT STATE CLAIM
Damages And Declaratory Relief Action For Litton Loan Service's Violation of the
FLORIDA STATUTE CHAPTER 701.04 (1)

202.     Plaintiffs incorporate paragraphs 1 to 201, inclusive, herein, as though set forth herein in full. Substance prevails over form.

203.     Proper demand was made upon Litton on 10/28/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

204.     On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

61

205.     That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law.

206.     That, had Litton Loan Servicing, LP answered, then they would be forced to admit, under oath, that they had no interest in the loan which was the subject of the litigation; would have to admit that Washington Mutual Bank, FA was paid in full; and that there never existed a servicing agreement between Litton Loan Servicing, LP and Washington Mutual Bank, FA.

Wherefore Plaintiffs seek relief as accorded by the Statute, including, but not limited to:

    a.     Statutory Compensatory damages for each separate violation according to proof;

    b.     Exemplary damages for each separate violation based on the net worth of the Defendant, Litton Loan Servicing, LP to the extent permitted by law;

    c.     Declaratory relief, including permanent injunctive relief, prohibiting Litton Loan Servicing, or any of their agents or assigns, from any further breaches of the statute;

    d.     Reasonable attorney's fees and court costs according to proof;

    e.     Such other and further relief as the court deems just and proper.

## COUNT ELEVEN:
## PLAINTIFFS v. GMAC MORTGAGE, LLC

Damages And Declaratory Relief Action For Failure GMAC Mortgage LLC's Failure To Acknowledge Receipt Of HAMP Application; Willful And Malicious Failure To Comply With Any And All Of Their Obligations Under The Servicer Participation Agreement With Regards To Plaintiffs, In Violation Of The Home Affordability Modification Program – BREACH OF CONTRACT, BAD FAITH BREACH OF CONTRACT THIRD PARTY BENEFICIARY

207.     Plaintiffs incorporate paragraphs 1 to 195, inclusive, herein, as though set forth herein in full.

208.     The Making Home Affordable Program was introduced in February 2009 by the Obama Administration which was intended to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure.

62

209. Because the stated purpose of the program was partly designed to help homeowners, homeowners, including the Plaintiffs, were the intended third party beneficiaries of the Program.

210. In March of 2009, the Treasury Department (Treasury) issued uniform guidance for loan modifications across the mortgage industry, and updated those guidelines with policy announcements.

211. The MHA Handbook for Servicers of Non-GSE Mortgages (Handbook) was issued to provide guidance for servicers of mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac.

212. GMAC Mortgage LLC (hereinafter GMAC) signed the HAMP servicer participation agreement on April 13, 2009, becoming a participant in the Home Affordable Modification Program (HAMP), by signing the Servicer Participation Agreement (SPA).

213. Defendant GMAC registered and executed a Servicer Participation Agreement, related documents, and one or more Service Schedules (SPA) with the Program Administrator on or before April 13, 2009.

214. Plaintiffs were informed, believe, and thereon allege, that, contrary to the statements of GMAC, Litton Loan Servicing, LP, at all relevant times, had a servicing agreement with RFC Homecomings and GMAC.

215. That Plaintiffs filed a formal complaint with RFC Homecomings (hereinafter referred to as RFC) and GMAC, regarding the fraudulent conduct of the Defendant, Litton Loan Servicing, LP.

216. That, in order to conceal their conspiracy, complicity, cooperation and agency relationship with Litton Loan Servicing, LP, GMAC individually and on behalf of RFC told the Plaintiffs that no one services the loans for GMAC and they service their own loans.

```
From: GMAC 1st Mortgage Servicing [customer_service@gmacm.com]
Sent: Wednesday, December 29, 2010 8:15 AM
To:   Barry B. Eskanos
Subject:   Re: * AND * / * * USE OF FORGED PROMISSORY NOTE

Dear Customer,
```

63

```
In response to your inquiry, please be advised, GMAC Mortgage does not have other
mortgage companies service loans on our behalf.
```

217. The statements made using means of interstate commerce were false.

218. The SPA governs servicer participation in MHA for all Non-GSE Mortgages.

219. GMAC and Litton Loan Servicing, LP on behalf of themselves and the lenders whose loans they service, agreed to abide by the terms of the handbook as part of the Servicer Participation Agreement (SPA).

220. All participating servicers, including GMAC and Litton Loan Servicing, LP (hereinafter referred to as Litton) acting on behalf of GMAC, and RFC, are required, among other things, to consider all eligible mortgage loans for Services (as defined in the SPA) unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. MHA 1.1

    a. Pursuant to the Handbook, GMAC, RFC, and Litton cannot escape liability by simply referring the matter to their lawyers.

    b. The Handbook, in pertinent part says that if the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA, thereby making GMAC responsible for the conduct of Litton.

    c. GMAC, by and through their agent, Litton, individually and on behalf of GMAC and RFC, instructed Akerman Senterfitt, its lawyers to act on their behalf, and thus GMAC is responsible for all the willful violations, intentional and negligent misconduct of its lawyers and co-conspirators as pled herein, in failing in every respect to meet the requirements of HAMP.

    d. All of the wrongdoings complained of herein, include the conduct of Akerman Senterfitt as the agent and subcontractor of GMAC.

64

221.    As further described in Section 1.3, participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out the requirements of the SPA. MHA 1.1, but Plaintiffs are informed, believe and thereon allege, that Litton failed to use reasonable efforts to contact GMAC regarding the Plaintiffs; and, once GMAC was contacted by the Plaintiffs, failed to request Litton to resolve the complaints of the Plaintiffs.

222.    In 2009, Congress passed the Helping Families Save Their Homes Act of 2009, which includes legal protection for servicers that modify residential mortgages.

223.    It was intended to encourage more servicers to modify more mortgages for the benefit of the homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

224.    The bill essentially provides authority for, and legal protection for servicers to alter mortgage contracts and, as the argument goes, investor contracts where mortgages have been securitized.

225.    Thus, not only does no legal impediment existed for GMAC through Litton Loan Servicing LLC to grant a loan modification on behalf of GMAC, RFC or even Washington Mutual Bank, FA (if it existed or were so entitled) to any and all individuals who qualify, but also every action taken by the Government was intended to benefit the Homeowner, of whom, the Plaintiffs fall within that class of individuals it was designed to protect.

226.    In addition to the normal obligation to obey all laws, and the implied covenants of good faith and fair dealing that are found in every contractual agreement, the SPA requires that GMAC, RFC and Litton Loan Servicing, individually and acting on behalf of GMAC and RFC, fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP.

a.      Section 5 of the Federal Trade Commission Act prohibiting unfair or deceptive acts or practices.

65

b.      The Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibiting discrimination on a prohibited basis in connection with mortgage transactions.

c.      The Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.

d.      The Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

e.      The Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification.  These laws also prohibit red-lining.

f.      The Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information.

g.      The Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act.

h.      Racketeering, Conspiracy to Engage in a Pattern of Racketeering Activity, (RICO) 18 U.S.C. 1961 et seq.; 18 U.S.C. 1964, (Civil RICO Remedies);

i.      Conspiracy to commit and commission of Mail and Wire Fraud 18 U.S.C., SECTIONS 1341, 1343;

j.      Conspiracy to commit and commission of Bank Fraud 18 U.S.C. 1341, 1344;

k.      Conspiracy to commit and commission of 18 U.S.C. § 1001;

l.      Conspiracy to commit and commission of 18 U.S.C. § 1005;

227.   If Litton Loan Servicing, LP, individually and on behalf of GMAC Mortgage, LLC., actually legally serviced any loan for GMAC, RFC Homecomings, or Washington Mutual Bank, FA then Plaintiffs

66

would have received from Litton Loan Servicing, LP, on behalf of at least one of the defendant entities, at a minimum, a response to their HAMP loan modification request, or been provided the H4H application or responded to the Florida Statute Estoppel Demand Pursuant to Florida Statute 701.04 (1).

228.    Defendant GMAC and RFC by and through its servicing agent, Litton Loan Servicing, LP, did not respond, because they had no legal right or basis upon which to provide a response.

229.    The Plaintiff's property qualifies under the conditions required of HAMP, and the Plaintiff would have been eligible for HAMP, including, but not limited to, the following conditions:

        a.    Mortgage loan was originated on or before January 1, 2009;

        b.    Mortgage loan was not previously modified under HAMP.

        c.    The Mortgage loan is delinquent or default is reasonably foreseeable.

        d.    The Mortgage loan is secured by a one unit property, which is the principal residence of the Plaintiff.

        e.    The subject property is not vacant or condemned.

        f.    The borrower has documented financial hardship and represented she does not have sufficient liquid assets to make the monthly mortgage payments because of a reduction in her salary and a reduction in her spouses work to part time status.

        g.    The Plaintiff's monthly mortgage payment (including principal, interest, taxes, and insurance) is greater than 31 percent of the Plaintiff's verified monthly gross income.

        h.    The Plaintiff is willing to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.

        i.    The Current unpaid principal balance (UPB) of the mortgage loan prior to capitalization is not greater than $729,750.

        j.    The Plaintiff offered to make a timely first trial period payment on or before December 31, 2012, but no TPP was ever offered to the Plaintiff.

67

      k.     The Plaintiff is in active litigation, and is eligible for HAMP.

230.    Litton Loan Servicing, LP, individually and on behalf of GMAC Mortgage, LLC. was required to communicate with clear written information designed to help the borrower understand the modification process in accordance with the HAMP guidelines and Handbook.

231.    Litton Loan Servicing, LP, individually and on behalf of GMAC has failed and refused to communicate with the Plaintiff, and referred the Plaintiff to their attorney, who has also refused to provide any information regarding HAMP; who then expressly, blatantly and openly refused to comply with the statutory requirements of providing an estoppel letter; and has willfully violated every provision of the HAMP and the handbook.

232.    Plaintiffs put GMAC on formal notice of the conduct complained of herein, as early as when the complaint was filed in March of 2005 and as the case progressed, and filed further complaints with GMAC in December of 2010 and June of 2011.

233.    As late as June of 2011, although GMAC and were fully apprised that Litton failed in every respect to obey the statutes complained of herein, and has a toll free number for HAMP applications, the Defendant, GMAC, told Plaintiffs they were not allowed to call GMAC or RFC; not allowed to discuss HAMP with GMAC; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with GMAC, but instead, Plaintiffs were told by GMAC they would have to contact Litton.

234.    Although GMAC has a toll free number, the Plaintiff was told he was not allowed to call GMAC; not allowed to discuss HAMP with GMAC; nor was he allowed to discuss the HAMP modification process or other alternative modification programs with GMAC.

235.    GMAC and their designated agents, (in this case, Litton) are required to maintain adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents.

68

236.     Litton Loan Servicing, LP, individually and on behalf of GMAC Mortgage, LLC., and GMAC has ratified the wrongful conduct of Litton in every respect and after having been fully apprised of their conduct, has refused to acknowledge receipt of Plaintiffs HAMP application; refused to respond to the application; refused to discuss the application with Plaintiff; and willfully violated the following regulations:

237.     Although Section 5 of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC, used false affidavits; filed a forged promissory note; committed perjury and numerous acts of fraud upon the court and the Plaintiff in order to obtain a judgment of foreclosure.

238.     Although the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act, prohibits discrimination on a prohibited basis in connection with mortgage transactions, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC discriminated against the Plaintiff because of her gender and her religion.

239.     Although the Real Estate Settlement Procedures Act (RESPA) which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC failed to provide proper documentation in violation of RESPA.

240.     Although the Fair Debt Collection Practices Act which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC tendered multiple demands seeking payment on behalf of RFC, but obtained a judgment in the name of Washington Mutual Bank, FA, informing the court that the only entity entitled to recover was Washington Mutual Bank, FA.

69

241.    Each letter and piece of correspondence sent by Litton, including billings for attorneys fees, on behalf of GMAC with GMAC's consent, and full ratification after being fully apprised of their conduct, individually and doing business as RFC was a separate violation of the Fair Debt Collection Practices Act,.

242.    Although the Fair Lending Laws, which ensure that servicers and lenders do not treat a borrower less favorable on grounds, such as race, religion, national origin, gender, marital or familial status, age handicap, or receipt of public assistance income in connection with any loan modification, (these laws also prohibit red-lining), Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC has discriminated against the Plaintiffs on the basis of her gender and her religion.

243.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC negotiated modifications of loans with others, but refused to even consider the Plaintiffs, failing to acknowledge or respond to the Plaintiffs application.

244.    Although the Fair Credit Reporting Act which regulates the collection, dissemination, and use of consumer information, including consumer credit information, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC used false information in reporting consumer credit information to credit reporting agencies about the Plaintiff.

245.    Although the Regulation B, which states that a borrower who applies for, and is denied, a loan modification must receive an adverse action notice under Regulation B of the Equal Credit Opportunity Act Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, and GMAC ratified the conduct of Litton, who intentionally and willfully failed and refused to comply with Regulation B by failing to timely respond to the HAMP application, thus violating Regulation B.

246.    Under Florida Law, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, was required to provide an estoppel letter pursuant to Florida Statutes Chapter 701.04 (1), which says, in pertinent part:

70

"Within 14 days after receipt of the written request of a mortgagor, the holder of a mortgage shall deliver to the mortgagor at a place designated in the written request an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage, including principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance. Whenever the amount of money due on any mortgage, lien, or judgment shall be fully paid to the person or party entitled to the payment thereof, the mortgagee, creditor, or assignee, or the attorney of record in the case of a judgment, to whom such payment shall have been made, shall execute in writing an instrument acknowledging satisfaction of said mortgage, lien, or judgment and have the same acknowledged, or proven, and duly entered of record in the book provided by law for such purposes in the proper county. Within 60 days of the date of receipt of the full payment of the mortgage, lien, or judgment, the person required to acknowledge satisfaction of the mortgage, lien, or judgment shall send or cause to be sent the recorded satisfaction to the person who has made the full payment. In the case of a civil action arising out of the provisions of this section, the prevailing party shall be entitled to attorney's fees and costs."

247.     Proper demand was made upon Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendants, GMAC and RFC, on 10/29/2010 pursuant to said statute to provide Plaintiff with an estoppel letter.

248.     On February 18, 2011, well past the deadline of the statute, Litton's lawyers sent a letter stating unequivocally that Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC and RFC, and each of them, received the Plaintiff's demand pursuant to Florida Statute 701.04(1) and said "Litton will not be providing this letter".

249.     That said refusal was a willful, malicious, and wanton violation of statute and a direct violation of Florida Law, as well as a direct violation of the requirement of the HAMP guidelines wherein "the SPA requires that [GMAC and Litton Loan Servicing] fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

71

250.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, pursuant to the HAMP guidelines, is required to make a reasonable effort to solicit borrower by performing at a minimum, the following acts:

a.    The servicer (including Litton and GMAC) is to make a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; -  (Litton made none) and

b.    The servicer (including Litton and GMAC) is to send two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail.  (Litton, individually, and on behalf of GMAC and RFC's only correspondence was the bad faith demand letters, never any response or mention of the HAMP or other rights of the Borrower).

c.    Any contact with eligible borrowers, whether by telephone, mail or otherwise, must:

1.    Advise borrowers that they may be eligible for HAMP; MHA Handbook v 2.0. (Litton and GMAC made no such effort nor provide no such advice).

2.    Clearly describe the Initial Package that the borrower is required to submit pursuant to the requirements outlined in Section 4, and state what other information the servicer needs to complete the HAMP analysis;  (Litton, individually and on behalf of GMAC, never discussed HAMP, refused to discuss HAMP with the Plaintiffs, and never reviewed the Plaintiffs application.)

3.    Provide a toll-free telephone number through which the borrower can reach a loan servicer representative; (Litton, individually and on behalf of GMAC stated that Plaintiff is not permitted to call them at all, and GMAC required Plaintiffs to call Litton) and

4.    Identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date. (Litton, individually and on behalf of GMAC, refused to provide any information regarding HAMP or mention the application whatsoever).

72

5.      All contact attempts must be documented in the servicing file.  If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to June 1, 2010, resolicitation of the borrower is not required. (If Litton, individually and on behalf of GMAC, documented any efforts, then they would be fraudulent and further violations of the agreement.)

251.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC failed to make ANY contact with the Plaintiff; refused to discuss the matter with the Plaintiff; refused to provide a number for the Plaintiff to discuss the matter with the Servicer; and refused to comply with all the requirements set forth in this complaint.

252.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC; and GMAC separately agreed, that they were further required to, and willfully failed and refused to comply with each and every one of the following conditions:

a.      The servicer (including Litton and GMAC) must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package, which is required to be submitted by the borrower to request a HAMP modification.

b.      The communication should:

1.      Describe the income evidence required to be evaluated for HAMP;

c.      Provide the RMA (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

d.      Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

e.      The communication should also include clear language stating that during the HAMP evaluation the home will not:  (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated.  In the communication, the servicer **must** include a specific

73

date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication.

f.      If Right Party Contact is established prior to satisfaction of the Reasonable Effort standard, the **servicer must continue** to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

g.      If Right Party Contact is established, but the borrower does not submit an Initial Package, the **servicer must resend** the Initial Package communication. Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication. If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

h.      If Right Party Contact is established, but the borrower submits an incomplete Initial Package within the required time period, the servicer (including Litton and GMAC) **must comply** with the "Incomplete Information Notice" requirements set forth below in Section 2.3.3. If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing an Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

Servicers **must acknowledge receipt** of the Initial Package within 10 business days per the requirements in Section 4.5 and respond within 30 calendar days with either an Incomplete Information Notice (as outlined in Section 2.3.3), a TPP Notice (as outlined in Section 8.1) or a Non-Approval Notice (as outlined in Section 2.3.2).

253.    Pursuant to the provisions of the agreement, Plaintiffs are entitled to a stay as Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC failed in every respect to meet the provisions of the SPA.

74

254.   Pursuant to the provisions of the SPA, Litton, GMAC and RFC, intentionally and willfully

failed to comply with each and every provision as set forth below:

3   Protections Against Unnecessary Foreclosure
3.1   Suspension of a Referral to Foreclosure
A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:

- The borrower is evaluated for HAMP and is determined to be ineligible for the program;

or

- The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; or

- The servicer has established Right Party Contact, has sent at least two written requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests;

or

- The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer in its servicing system and/or mortgage file.

3.2   Suspension of Foreclosure Proceedings in Process
With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP based on verified income, and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered.

3.3   Suspension of Scheduled Foreclosure Sale
When a borrower submits a request for HAMP consideration after a foreclosure sale date has been scheduled and the request is received no later than midnight of the seventh business day prior to the foreclosure sale date (Deadline), the servicer must suspend the sale as necessary to evaluate the borrower for HAMP...

3.4   Mitigating Foreclosure Impact
The servicer must take the following actions to mitigate foreclosure impact:

3.4.1   Simultaneous Trial Period Plan and Foreclosure Explanation
When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a TPP, the servicer must provide the borrower with a written notification that explains, in clear language, the concurrent modification and foreclosure processes and that states that even though certain foreclosure activities may continue, the home will not be sold at a

75

foreclosure                                 sale while the borrower is being considered for HAMP or while the
borrower is making payments under a TPP…
     3.4.2   Foreclosure Attorney/Trustee Communication
     Servicers must develop and implement written policies and
procedures to provide notification to their foreclosure
attorney/trustee regarding a borrower's HAMP status, including                       whether
the borrower is potentially eligible for HAMP (and is                       subject to Section 2.2),
and whether the borrower is being                       evaluated for, or is currently in, a TPP.
Servicers must ensure that                       their foreclosure attorney/trustee adheres to all of the
requirements                       of Section 3.1, Section 3.2 and Section 3.3 with respect to referral
to foreclosure, stay of foreclosure actions and suspension of
foreclosure sales.
     3.4.3   Certification Prior to Foreclosure Sale
     Servicers must develop and implement written procedures
applicable to all loans that are potentially eligible for HAMP (and                       are subject
to Section 2.2) that require the servicer to provide to the                       foreclosure attorney/trustee a
written certification that (i) one of                       the five circumstances under Section 3.1 exists,
and (ii) all other                       available loss mitigation alternatives have been exhausted and
a                       non-foreclosure outcome could not be reached.  This certification
must be provided no sooner than seven business days prior to the
scheduled foreclosure sale date (the Deadline) or any extension                       thereof.

255.   Plaintiffs were further entitled, and never received the required acknowledgement of the

Initial Package.

4.5 Acknowledgment of Initial Package
Within 10 business days following receipt of an Initial Package, the servicer
**must** acknowledge in writing the borrower's request for HAMP participation
by sending the borrower confirmation that the Initial Package was received
and a description of the servicer's evaluation process and timeline. If the
Initial Package is received from the borrower via email, the servicer may
email the acknowledgment.  Servicers must maintain evidence of the date of
receipt of the borrower's Initial Package in its records.
A single written communication sent within 10 business days of receipt of a
borrower's request for HAMP participation may also include, at the servicer's
discretion, the results of its review of the Initial Package.

256.   Although Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant,

GMAC and RFC, and GMAC separately, **MUST** comply, Litton Loan Services, LP, on their own behalf,

and on behalf of the co-defendant GMAC not only failed to acknowledge their receipt of the Initial Package

that was sent to them and received on May 4, 2011, but wantonly, willfully and intentionally failed and

76

refused in every respect to comply with any of the provisions of HAMP contained herein for the benefit of the Plaintiff.

257.   Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC was **obligated** to review the documentation submitted by Plaintiff on May 4, 2011, within 30 days, and failed and refused to do so.

258.   Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC had 30 days wherein they were contractually obligated to review the initial package, and they willfully, wantonly and intentionally failed and refused in every respect to do so.

> 4.6 Review of Initial Package
> Within 30 calendar days from the date an Initial Package is received, the servicer **must** review the documentation provided by the borrower for completeness.  If the documentation is incomplete or insufficient for use in underwriting, the servicer must send the borrower an Incomplete Information Notice in accordance with the guidance set forth in Section 2.3.3.
> If the borrower's documentation is complete, the servicer must evaluate the borrower's eligibility for HAMP and either:
> -       Send the borrower a TPP Notice (see Section 8.1); or
> -       Make a determination that the borrower is not eligible for HAMP and communicate this determination to the borrower in accordance with the guidance in Section 2.3.2.

259.   Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC had only 30 days from May 11, 2011 to wherein they were contractually obligated to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination, and utterly, willfully, wantonly, and intentionally failed and refused to do so.

260.   Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC had 30 days from May 11, 2011 wherein they were contractually obligated to provide the Plaintiff with a determination, and willfully, wantonly, and intentionally failed and refused to do so in breach of that agreement.

6 Underwriting

77

> Servicers must determine the borrower's eligibility for a modification using information obtained in the Initial Package and subsequently verified. **Servicers are required** to complete their assessment of borrower eligibility and notify the borrower of the eligibility determination within 30 calendar days of receiving all required borrower documentation.

261.   Furthermore, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC, and GMAC separately was contractually obligated to consider the Plaintiff for Hope for Homeowners, and utterly failed and refused to do so.

262.   Pursuant to the Handbook, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC was jointly and separately contractually obligated to consider the Plaintiff for Hope for Homeowners, as set forth herein.

> 6.2 Coordination with Hope for Homeowners
> Servicers are **required** to consider a borrower for a refinance through the Federal Housing Administration's HOPE for Homeowners (H4H) program when feasible.  Consideration for an H4H refinance should not delay eligible borrowers from receiving a TPP Notice.  The servicer's obligation as it relates to the H4H requirement is that while the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through H4H. This assessment would involve asking the following set of questions:
> -      Will the loan amount exceed $550,440?  No.
> -      Has the borrower made less than six (6) full payments during the life of the first lien loan?  No.
> -      Does the borrower have an ownership interest in other residential real estate, including any second homes or rental properties?  No.
> -      Was the mortgage to be refinanced originated after January 1, 2008? No.
> -      Does the property contain more than one (1) unit?  No.
> If the answer to all of these questions is "NO", the borrower may be eligible for H4H. (As is the precise case for the Plaintiff, herein). In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender.

263.   Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC failed and refused to notify the Plaintiff of their consideration, as well as Litton individually and on behalf of GMAC, failed and refused to consider the Plaintiff, entitlement to relief under Hope for Homeowners.

78

264.    Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC was obligated to apply the modification steps until the monthly mortgage payment ratio is reduced to 31 percent, but utterly failed and refused to do so.

265.    Pursuant to the Handbook, section 6.3 Standard Modification Waterfall Servicers (including GMAC and LITTON) **must** apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent (target monthly mortgage payment ratio).

266.    A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy HAMP requirements and no incentives will be payable in connection with the modification.

267.    Even though clearly, Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC and LITTON, **MUST** have taken action, they failed and intentionally refused to comply with every requirement of HAMP; failed and refused to comply with State and Federal Law; committed fraud; willfully and maliciously acted with the sole intent to deprive Plaintiffs of their property.

268.    Because there existed a contract between GMAC, Litton Loan Servicing, LP and the US Treasury Department which was intended to benefit the Plaintiffs, and others similarly situated; and Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant, GMAC, accepted consideration for each loan modification application from the US Treasury Department; because there was a mutual intent to benefit the Plaintiffs, and others similarly situated; and the Plaintiffs were deprived of their opportunity to have their HAMP application, their H4H application properly and timely reviewed, the Plaintiffs suffered irreparable harm.

269.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant

79

GMAC further owed the Plaintiffs and others similarly situated the implied obligation of good faith and fair dealing, which is implied in every contract.

270.    Defendant Litton Loan Services, LP, on their own behalf, and on behalf of the co-defendant GMAC committed intentional, wanton and willful breaches of the covenants of good faith and fair dealing; intentional, wanton and willful breaches of the agreement with the US Treasury Department; and the Plaintiffs, and others similarly situated were the intended third party beneficiaries of that agreement between the US Treasury Department, GMAC and Litton Loan Servicing, LP and Plaintiffs as the intended beneficiary, and Plaintiffs, and others, were harmed as a result of those breaches.

271.    Plaintiffs are entitled to receive compensatory damages according to proof;

272.    Plaintiffs are entitled to receive exemplary damages based on the net worth of GMAC for their malicious, wanton and willful breaches of the agreement and their ratification of the wrongful conduct of their co-conspirators to the extent permitted by law.

273.    Wherefore Plaintiffs respectfully request that the court:

A.    Issue an order requiring GMAC, jointly and severally, with the remaining co-defendants and their lawyers to permanently stay the foreclosure proceedings against the Plaintiff and dismiss them with prejudice;

B.    Find that GMAC, on their own behalf, and on behalf of the co-defendants committed the wrongful and illegal acts in violation of the SPA which, as stated above, "requires that [GMAC and Litton Loan Services, LP], on their own behalf, and on behalf of the remaining co-defendants fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to HAMP."

C.    Find that GMAC, on their own behalf, and on behalf of the remaining co-defendants, were in breach of the SPA agreement with the US Treasury Department, intentionally, willfully, wantonly

80